**BREWSTER OF LYNCHBURG, INCORPORATED, Plaintiff–Appellant,**

v.

**DIAL CORPORATION, Defendant–Appellee.**

No. 93–2391.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1994.

Decided Aug. 29, 1994.

**ARGUED:** David T. Petty, Jr., Petty, Livingston, Dawson & Devening, Lynchburg, VA, for appellant. Frank Kenneth Friedman, Michael Alan Cleary, Woods, Rogers & Hazlegrove, Roanoke, VA, for appellee. **ON BRIEF:** Robert C. Berkley, Petty, Livingston, Dawson & Devening, Lynchburg, VA, for appellant. Kevin S. Blair, Woods, Rogers & Hazlegrove, Roanoke, VA, for appellee.

Before WIDENER, WILKINS and HAMILTON, Circuit Judges.

Affirmed in part, vacated in part and remanded by published opinion. Judge HAMILTON wrote the opinion in which Judge WIDENER and Judge WILKINS joined.

## OPINION

HAMILTON, Circuit Judge:

In this case, we must decide whether Dial Corporation (Dial) breached its contract to purchase plastic bottles (the Contract) from Brewster of Lynchburg, Inc. (Brewster). In its complaint, Brewster alleged, *inter alia,* that Dial breached the Contract by: (1) canceling the Contract before its first anniversary; (2) providing inadequate molds to Brewster; (3) utilizing other suppliers for its plastic bottle requirements; and (4) supplying Brewster with inadequate amounts of resin. The district court granted summary judgment in favor of Dial on all theories.

For the reasons stated herein, we affirm the summary judgment with respect to Brewster's first theory. However, because the district court failed to provide any reasoning for granting summary judgment with respect to the latter three theories and our independent review of the record reveals no basis for summary judgment, we vacate that portion of the district court's decision. On remand, the district court should identify the rationale supporting summary judgment on these three theories.

## I

Brewster is a Virginia corporation headquartered in Lynchburg, Virginia. Prior to commencing this lawsuit, Brewster manufactured plastic bottles. Dial is a Delaware corporation headquartered in Phoenix, Arizona. Dial manufactures personal care and home cleaning products.

In 1987, Dial grouped several of its plants into a "Special Business Division" so that it could examine and correct profitability problems at these plants. The plants within this division produced various liquid products such as bleach and ammonia. At the time of its creation, the Special Business Division consisted of eight liquid product plants in: Toledo, Ohio; Dallas, Texas; Denver, Colorado; Salem, Virginia; Auburndale, Florida; Eagan, Minnesota; Tacoma, Washington; and Arlington, Texas. This Division also included three blow molding plants in: Baltimore, Maryland; Auburndale, Florida; and Toledo, Ohio. These plants manufactured the plastic bottles for the liquid products.

As part of its efforts to enhance the profitability of the Special Business Division, Dial considered various options for each plant. These options included eliminating product lines at particular facilities, expanding particular facilities, and closing or selling plants which could not be made profitable. Accordingly, Dial authorized a financial analyst to study the options for the Salem, Virginia facility. In February 1988, the analyst issued his report which concluded that "[t]he Salem plant at its current level of production is extremely unprofitable and should be closed." (J.A. 699). From 1987 to the present, Dial either closed or sold all of the plants within the Special Business Division except for the one in Auburndale, Florida.

In early 1988, pursuant to its restructuring of the Special Business Division, Dial decided to close its Baltimore, Maryland facility which manufactured plastic bottles for the liquid products produced at Dial's plant in Salem, Virginia. Because it was too costly to ship plastic bottles to Salem from one of the other manufacturing facilities, Dial sought to procure an outside supplier of plastic bottles for its Salem operations. In response to inquiries by Dial, Guy Arriola, the president of Brewster, sent Dial a price quote on March 1, 1988 offering to satisfy for five years the plastic bottle requirements generated by Dial's Salem, Virginia operations. Thereafter, representatives from Dial visited Brewster's facilities in Lynchburg to determine whether Brewster could provide the plastic bottles which Dial needed. After the visit, Dial informed Brewster that it needed to install particular machinery and procure a suitable supply of resin, a necessary ingredient for manufacturing plastic bottles, before Dial would agree to purchase its plastic bottle needs from Brewster.

On March 31, 1988, Brewster sent Dial a revised price quote proposal for supplying Dial's plastic bottle needs for the Salem, Virginia plant. The revised price quote expressly provided "[t]his proposal is based on a five year commitment of at least present minimal usage." (J.A. 137). Brewster's proposal also indicated that it would acquire three machines necessary to manufacture the plastic bottles required by Dial and that Brewster could begin production in late May or early June.

Upon receiving this proposal, on April 20, 1988, Dial and Brewster representatives again met in Lynchburg to discuss a potential contract for supplying the plastic bottle needs of Dial's Salem, Virginia facility. During that meeting, Dial indicated that it would commit to Brewster through annual purchase orders rather than with one written contract. On June 1, 1988, Dial sent Brewster a Purchase Order offering to purchase its plastic bottle requirements from Brewster from July 1, 1988 to June 30, 1989. This Purchase Order estimated the requirements for this period at 7,850,000 but added "[q]uantities are estimated only and do not bind Dial to purchase any minimum quantity." (J.A. 45). The Purchase Order also provided, in relevant part:

> [Dial] agrees to purchase its Salem bottles requirements from Brewster through 6–30–93 provid[ed] the Salem plant is not either sold or closed, and providing Dial does not bring the blow-molding operation in-house. Dial will provide Brewster with 90 day written notice of cancellation should one of these events occur.

(J.A. 46). The boiler-plate language in the Purchase Order provided, in relevant part:

> This offer to purchase is made only on the express condition that seller accepts all conditions on reverse side hereof.
>
> \*    \*    \*    \*    \*    \*
>
> This purchase order, together with any documents expressly incorporated herein by reference constitutes the entire agreement between the parties and supersedes all other agreements and understandings between the parties. . . .  No oral agreement or other undertaking shall in any way modify or change this purchase order and neither party shall claim any modification, amendment or release from any of the terms or conditions set forth herein except by mutual written agreement to that effect signed by Seller and an authorized representative of the Dial Corp. . . .
>
> \*    \*    \*    \*    \*    \*
>
> This agreement shall be interpreted and governed according to the laws of the State of Arizona.

(J.A. 45, 48).

On June 23, 1988, Brewster's Chief Executive Officer, Jim Miller, sent a letter to Dial objecting to several provisions within the Purchase Order. The letter stated, in relevant part:

> As the general terms and conditions state . . . that the purchase order in and of itself constitutes the entire agreement between the parties including any addendums thereto, and supersedes any other previous understandings or agreements between either of us, I thought it would be wise that I go over . . . our feelings about the activities in general.
>
> \*    \*    \*    \*    \*    \*
>
> I believe there are several areas where a meeting of the mind was reached here in Lynchburg, that has not transposed well to the purchase order.

(J.A. 147). The letter then outlined Brewster's objections to the Purchase Order. With respect to the quantity to be purchased, Brewster objected to the provision indicating that Dial was not obligated to purchase any minimum quantity from Brewster. However-

er, Brewster did not suggest a particular minimum purchase obligation. With respect to the escape clause, Brewster indicated that it had to be "based on a year to year cycle and can occur only on the anniversary date of our agreement." (J.A. 150). The letter concluded "we need to properly resolve these issues in order to go forward with all positive feelings." *Id.*

On June 28 and 30, 1988, Scott Pearl, vice-president of Brewster, and Christine Mann, Dial's buyer and signatory to the Purchase Order, discussed the parties' disagreements over the terms in the Purchase Order. Brewster contends that, during the latter telephone conversation, Mann orally agreed to Brewster's demands with respect to the escape clause, *i.e.*, that Dial could only cancel the Contract on its anniversary.

On July 5, 1988, Brewster and Dial mailed each other written documents confirming the oral agreements reached during these telephone conversations. Brewster's letter provided:

> Confirming our conversation of 6–30–88 and the points of discussion that referenced our letter of 6–23–88 . . . , the following clarifications have been agreed to and will subsequently be included as an addendum to your purchase order.

(J.A. 156). With respect to the escape clause, the letter provided "[a]s agreed, the escape clauses are based on a year to year cycle on the anniversary date of the purchase order." (J.A. 157). However, the letter contained no suggestion that the parties' oral agreement specified a minimum amount which Dial was obligated to purchase during the Contract. Finally, the letter stated that Brewster needed "the addendum to the purchase order on an item by item basis to reflect our agreement made on the phone on 6–30–88." *Id.*

Dial's written confirmation, entitled "Change Order," purported to confirm the oral agreement on June 28, 1988. In this Change Order, Dial incorporated several of the concerns which Brewster had previously expressed. The Change Order, however, did not include Brewster's demand that Dial could only exercise the escape clause on the

Contract's anniversary. Moreover, the Change Order provided that "[a]ll other items and conditions according to [the] original purchase order ... remain unchanged." (J.A. 160).[1] Despite the inconsistencies in these writings, Brewster began full-scale production and shipment of plastic bottles to Dial by early July 1988.

In August 1988 Dial authorized the sale of its Salem, Virginia plant because of its continued unprofitability. Dial notified Brewster of the potential sale by letter dated August 8, 1988. In late September 1988, after the sale fell through, Dial elected to close the Salem facility. Dial notified Brewster of this decision by letter dated September 30, 1988. In this letter, Dial indicated that, because it was closing the Salem facility, it would terminate the Contract with Brewster in ninety days pursuant to the escape clause contained in the Purchase Order. On October 6, 1988, Brewster responded by letter, informing Dial that it could not terminate the Contract until June 30, 1989, the first anniversary of the agreement.

On November 17, 1988, Brewster's lender declared Brewster's working capital loan in default. Consequently, Brewster was forced to close its plastic bottle manufacturing operations on November 18, 1988. Because Dial believed Brewster could no longer furnish the plastic bottles for the remainder of the ninety day period, on December 1, 1988, Dial notified Brewster that Dial was expediting its termination of the Contract, effective immediately. At the same time, Dial arranged to procure its remaining plastic bottle needs from an alternative supplier, Arriola Plastics.

On February 8, 1991, Brewster filed suit against Dial in the Circuit Court of the City of Lynchburg, Virginia. Brewster's complaint asserted six counts, two tort claims and four contract claims. Counts Four and Six represented the tort claims, the first alleging that Dial fraudulently induced Brewster into contracting with Dial, the second alleging that Dial's breach of the implied covenant of good faith was so egregious as to amount to a tort warranting punitive damages.

Counts One, Two, Three and Five encompassed Brewster's contract claims. Count One essentially alleged that Brewster breached the Contract by: (1) terminating the Contract before its first anniversary; (2) failing to provide efficient molds to Brewster for its plastic bottle production; (3) obtaining plastic bottles from an alternative supplier during the Contract; and (4) supplying Brewster with inadequate amounts of resin. Count Two asserted that, because Brewster detrimentally relied on the oral agreement that the Contract would last one year, promissory estoppel precluded Dial from canceling the Contract before that date. Count Three alleged that Dial's version of the escape clause was unconscionable. Count Five asserted that Dial breached the implied covenant of good faith because it knew prior to entering into the Contract that it would close the Salem facility before one year.

On March 8, 1991, Dial removed this action to the United States District Court for the Western District of Virginia. Ten days later, Dial filed its answer and counterclaim. On March 9, 1992, Dial filed a motion for summary judgment on all of Brewster's claims. On August 4, 1992, after Brewster filed its response, the district court awarded summary judgment in favor of Dial on all six counts but did not resolve Dial's counterclaim.

The district court found the tort claims barred by the statute of limitations. With respect to the contract claims, the district court determined that the Contract between the parties included only those provisions contained in the June 1, 1988 Purchase Order and the July 5, 1988 Change Order. The district court reasoned that the integration clause in the original Purchase Order precluded any attempt by Brewster to supplement the writing with parol evidence of oral agreements regarding the escape clause. Because the Purchase Order allowed Dial to terminate the Contract under certain circumstances with ninety days advance notice, and the Change Order did not modify this provision, the district court determined that the

---

1. The Change Order also confirmed the parties' agreement that, to assist Brewster in manufac-
turing plastic bottles, Dial would supply Brewster with the necessary molds and resin.

Contract incorporated the Purchase Order's version of the escape clause.

Rejecting Brewster's promissory estoppel claim, the district court reasoned that Brewster could not reasonably rely on any oral promise which contradicted the clearly written escape clause in the Purchase Order. The district court further noted that Brewster's own letters recognized the need to incorporate any modifications to the Contract in writing. The district court also rejected Brewster's claim that Dial breached the implied covenant of good faith by terminating the Contract before one year, opining that this covenant could not alter the written terms of the Contract. Finally, the district court rejected Brewster's unconscionability claim.[2]

Brewster noted its appeal to this court on August 31, 1992. On March 10, 1993, we dismissed the appeal as interlocutory because the counterclaim remained unresolved before the district court. By order dated September 27, 1993, the district court dismissed Dial's counterclaim without prejudice. Brewster timely filed its notice of appeal with respect to its contract claims only.

## II

On appeal, Brewster first challenges the district court's conclusion that the Contract included the Purchase Order's version of the escape clause. Brewster reasons that the Contract could not include this term because Brewster expressly objected to it. Instead, Brewster asserts that the Contract encompasses that version of the escape clause on which the parties orally agreed during their June 30, 1988 telephone conversation, *i.e.,* Dial could terminate the Contract only on its anniversary. Because this version of the escape clause prohibited Dial from canceling the Contract before its first anniversary, Brewster concludes that Dial's termination of the Contract before that date constituted a breach.

Although we agree that the Contract included Brewster's version of the escape clause, we nonetheless hold that Dial's termination of the Contract did not amount to a breach under Arizona law. Thus, we conclude that the district court properly awarded summary judgment in favor of Dial on this claim.[3]

### A

■■■ In considering a motion for summary judgment, the district court must view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Thus, the nonmovant is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts ... resolved favorably to him." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; it may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.* We review a summary judgment decision *de novo. Id.*

### B

Because the Contract stipulates that Arizona law applies, we must determine how Arizona courts would rule in resolving this appeal. However, Arizona courts frequently resort to case law from other jurisdictions to

---

2. Although the district court failed to discuss Brewster's other contract allegations, it nevertheless granted summary judgment on these claims as well, concluding that Dial "is entitled to judgment as a matter of law with respect to [Brewster's] contract claims regardless of the theory on which [Brewster] relies." (J.A. 130).

3. We have consistently recognized that, even though we disagree with the reasoning of the district court, we may affirm the result on different grounds if fully supported by the record. *Stern v. Merrill Lynch, Pierce, Fenner & Smith,* 603 F.2d 1073, 1093 (4th Cir.1979); *Eltra Corp. v. Ringer,* 579 F.2d 294, 298 (4th Cir.1978).

interpret statutes modeled after the Uniform Commercial Code (U.C.C.). *Koenen v. Royal Buick Co.*, 162 Ariz. 376, 380, 783 P.2d 822, 826 (App.1989). Absent any Arizona authority on point, we utilize the same approach.

■ In reviewing the course of events in the present case, it is clear that the parties had not formed a contract when Dial issued its Purchase Order and Brewster responded with its June 23, 1988 objection letter. Under Arizona law, "for an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that [the] obligations involved can be ascertained." *Savoca Masonry Co., Inc. v. Homes & Son Constr. Co., Inc.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975). An acceptance is "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *K–Line Builders, Inc. v. First Fed. Savings and Loan Ass'n*, 139 Ariz. 209, 212, 677 P.2d 1317, 1320 (App.1988). In the present case, Brewster's objection letter stated "we need to properly resolve these issues in order to go forward with all positive feelings." (J.A. 150). Such language clearly reflects Brewster's refusal to assent to the terms within Dial's Purchase Order. Absent such assent or any performance by either party, no contract existed after the first exchange of writings.

■ However, in viewing the facts in the light most favorable to Brewster, we must assume that, during the June 28 and 30, 1988 telephone conversations between Brewster and Dial, the parties orally agreed to terms for Dial's purchase of plastic bottles from Brewster. The subsequent July 5, 1988 Change Order from Dial and the letter from Brewster attempted to confirm the terms of this oral agreement, but contained conflicting versions of the escape clause.

Under such circumstances, A.R.S. § 47–2207 determines the terms of the Contract between Dial and Brewster. Specifically, subsection one of this statute provides, in relevant part:

[A] written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms ... different from those ... agreed upon, unless acceptance is expressly made conditional on assent to the ... different terms.

A.R.S. § 47–2207(A) (Uniform Commercial Code § 2–207).

■ This code section displaces the common law's "last shot rule" which recognized that, when the parties exchanged conflicting forms but nonetheless performed their obligations, the contract encompassed the terms contained in the last writing submitted immediately prior to performance. *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1444 (9th Cir.1986). Thus, this section "give[s] neither party to a contract an advantage simply because it happened to send ... the last form." *Id. See also, Leonard Pevar Co. v. Evans Products Co.*, 524 F.Supp. 546, 551 (D.Del.1981) (Section 2–207 "disfavors any attempt by one party to unilaterally impose conditions that would create hardship on another party."). Instead, this statute "allow[s] parties to enforce their agreement ... despite discrepancies between an oral agreement and a written confirmation." *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill.App.3d 338, 42 Ill.Dec. 332, 338, 408 N.E.2d 1041, 1047 (1980).

According to A.R.S. § 47–2207, the fact that the written confirmations contain terms different from the prior oral agreement does not preclude the existence of a contract. Instead, as between merchants, the differing terms "become part of the contract unless ... notification of objection to them has already been given or is given within a reasonable time after notice of them is received." A.R.S. § 47–2207(B)(3). Official Comment Six to U.C.C. § 2–207 sheds further insight.[4] This comment provides, in relevant part:

Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation

---

**4.** Although the Arizona legislature has not formally adopted the official commentary to the U.C.C., Arizona courts nonetheless frequently resort to this authority when interpreting its ver-sion of the Code. *See, e.g., State v. Williams,* 134 Ariz. 411, 416, 656 P.2d 1272, 1277 (App.1982); *National Car Rental v. Fox,* 18 Ariz.App. 160, 500 P.2d 1148 (1972). We adopt the same approach.

sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to [*i.e.*, in the oral agreement], terms on which the confirmations agree, and terms supplied by this Act. . . .

Applying this statutory framework to the present case, because the confirmatory writings submitted by Dial and Brewster on July 5, 1988 contained different escape clauses, those conflicting terms drop out and the Contract encompasses that version of the escape clause to which the parties orally agreed during their June 28 and 30, 1988 telephone conversations. J. White and R. Summers, Uniform Commercial Code § 1–3 at 49 (3d ed.1988). Assuming, as we must for summary judgment purposes, that Brewster and Dial orally agreed to Brewster's version of the escape clause, A.R.S. § 47–2207 compels us to conclude that the Contract only allowed Dial to exercise the escape clause on the anniversary of the Contract.

In reaching this conclusion, we reject Dial's contention that, according to the decision in *Salt River Project Agricultural Improvement & Power District v. Westinghouse Elec. Corp.*, 143 Ariz. 368, 694 P.2d 198 (1984), the Contract must incorporate Dial's version of the escape clause. In *Salt River*, the buyer's purchase order contained terms different from the seller's subsequent acknowledgement. In determining the terms of the contract, the court held that the seller's acknowledgement controlled because the buyer subsequently accepted the goods "without protesting any of the terms" in the acknowledgement. *Id.* 694 P.2d at 204. In contrast, Brewster protested Dial's version of the escape clause upon receiving the Purchase Order. Furthermore, unlike the buyer and seller in *Salt River*, the parties to this appeal exchanged confirmatory documents *on the same day*, July 5, 1988. Thus, the facts in this appeal provide no basis for selecting Dial's confirmation, rather than Brewster's, as the writing which controls the terms of the Contract. In light of these two factual distinctions, we conclude that Dial

may not impose terms unilaterally to which Brewster never agreed. *Yeazell v. Copins*, 98 Ariz. 109, 113, 402 P.2d 541, 545 (1965); *Coronado Co., Inc. v. Jacome's Dep't. Store, Inc.*, 129 Ariz. 137, 140, 629 P.2d 553, 556 (App.1981).

■ We also cannot accept Dial's suggestion that Arizona's parol evidence rule, A.R.S. § 47–2202, prohibits us from resorting to the prior oral agreement to define the terms of the Contract. Specifically, because the Purchase and Change Orders expressly provide that they supersede any prior oral agreement and constitute the entire agreement between the parties, Dial contends that the parol evidence rule only allows us to rely on those writings to ascertain the terms of the Contract.

Arizona's version of the parol evidence rule provides, in relevant part:

> Terms with respect to which the confirmatory memoranda of the parties *agree* or which are otherwise set forth in a writing *intended by the parties to be a final expression of their agreement* . . . may not be contradicted by evidence of any prior agreement. . . .

A.R.S. § 47–2202 (emphasis added). By its express terms, this statute only prohibits parties from resorting to prior oral agreements to: (a) establish terms on which the confirmations already agree, or (b) to contradict a writing which the parties intended to be a final expression of their agreement. Neither of these conditions exist in the present case.

As previously discussed, the "confirmatory memoranda" contain *different* versions of the escape clause. Because § 47–2202 only precludes parol evidence which contradicts terms on which the confirmatory memoranda *agree*, the statute does not prevent us from resorting to the prior oral agreement to determine the proper version of the escape clause. *Airstream, Inc. v. CIT Financial Services, Inc.*, 111 Idaho 307, 312, 723 P.2d 851, 856 (1986); *Album Graphics*, 42 Ill.Dec. at 338, 408 N.E.2d at 1047. Moreover, although Dial's Purchase and Change Orders indicated that they embodied the final expression of the agreement, Brewster never expressly agreed to the terms in these writ-

ings, instead objecting to the escape clause contained in the Purchase Order. Under these circumstances, we cannot conclude that *both* Dial and Brewster intended the writings as a final expression of their agreement. *Step–Saver Data Sys., Inc. v. Wyse Technology,* 939 F.2d 91, 98 (3d Cir.1991); *Leonard Pevar Co.,* 524 F.Supp. at 552.[5]

■ We also reject Dial's contention that, because the Purchase and Change Orders provided "[t]his offer to purchase is made only on express condition that seller accepts all terms and conditions [of the Purchase and Change Orders]," (J.A. 45), the Contract could not contain terms different from those provided in these two documents. Courts uniformly recognize that, when there has been a prior oral agreement, a party to the contract may not unilaterally alter that agreement through confirmatory memoranda which condition acceptance on assent to terms different than those in the prior oral agreement. *Diamond Fruit Growers,* 794 F.2d at 1445; *Leonard Pevar Co.,* 524 F.Supp. at 550 n. 17; *American Parts Co., Inc. v. American Arbitration Ass'n,* 8 Mich. App. 156, 154 N.W.2d 5, 15 (1967).

■ Finally, we reject Dial's suggestion that our prior decision in *Harris v. Dial Corp.,* 954 F.2d 990 (4th Cir.1992) collaterally estops Brewster from asserting that the Contract includes terms not contained in the Purchase or Change Orders. For collateral estoppel to apply, "the issue precluded must be identical to [the] one previously litigated." *Ramsay v. U.S.I.N.S.,* 14 F.3d 206, 210 (4th Cir.1994) (citations omitted). In *Harris,* we considered "whether there was one contract between [Dial and Brewster] for supply of resin and manufacture of bottles, or whether these transactions were covered by two separate agreements." *Harris,* 954 F.2d at 992. By deciding that the resin supply and bottle manufacturing agreements "were embodied in one form—the change order," we concluded that Dial could offset money it owed Brewster under the bottle agreement by the

amount which Brewster owed Dial under the resin agreement. *Id.* at 993. In the instant matter, we must determine which version of the escape clause the Contract incorporated. Clearly, this issue is distinct from that involved in *Harris.*

## C

■ Our conclusion that Dial could not exercise the escape clause before the first anniversary of the Contract does not end our inquiry. Both Dial and Brewster acknowledge that the Contract obligated Dial to purchase all of the plastic bottle requirements generated by its Salem, Virginia facility. However, neither the oral agreement nor the confirmatory memoranda specified a minimum amount which Dial was obligated to purchase during the Contract. (Hutter Dep. 34). Instead, the Contract merely estimated that Dial's requirements would continue at its historic levels. *Id.*

When a contract requires a buyer to purchase all of its requirements from a seller, but does not specify a minimum quantity to be purchased, A.R.S. § 47–2306A dictates the purchase obligations of the buyer. This statute provides:

> A term which measures the quantity by ... the requirements of the buyer means such actual ... requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior requirements may be ... demanded.

*Id.*

Although this statute may appear to proscribe *both* unreasonably disproportionate increases and reductions in a buyer's requirements, judicial interpretations of this statute provide otherwise. Specifically, these authorities recognize that, while a buyer may not increase its requirements by an unreasonably disproportionate amount, it may re-

---

**5.** Brewster's failure to renew expressly its objection upon receiving the Change Order does not suggest that Brewster consented to Dial's escape clause, or intended the Change Order to reflect the final expression of the Contract. *See Western*

*Indus., Inc. v. Newcor Canada, Ltd.,* 739 F.2d 1198, 1205 (7th Cir.1984) (fact that term to which party originally objected was repeated in subsequent confirmatory document does not validate that term).

duce its requirements to any amount, including zero, so long as it does so in good faith. *Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333, 1338 (7th Cir.1988); *R.A. Weaver & Assocs., Inc. v. Asphalt Constr., Inc.,* 587 F.2d 1315, 1322 (D.C.Cir.1978); *HML Corp. v. General Foods Corp.,* 365 F.2d 77, 81 (3d Cir.1966). Thus, "with respect to requirements contracts ... the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business." *NCC Sunday Inserts, Inc. v. World Color Press, Inc.,* 759 F.Supp. 1004, 1008 (S.D.N.Y.1991) (quotations omitted). *See also Feld v. Henry S. Levy & Sons, Inc.,* 37 N.Y.2d 466, 373 N.Y.S.2d 102, 104–05, 335 N.E.2d 320, 322 (1975); Official Comment Two to U.C.C. § 2–306 (A.R.S. § 47–2306) ("[r]easonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance.").

The Seventh Circuit's decision in *Empire Gas* discusses the rationale supporting this interpretation of U.C.C. § 2–306(1). In that case, American Bakeries (AB) sought to convert its fleet of delivery vehicles from gasoline to propane. Consequently, AB executed a contract with Empire Gas (Empire) obligating AB to purchase "three thousand ... [conversion] units, more or less depending upon [AB's] requirements...." *Empire Gas,* 840 F.2d at 1335. The contract also obligated AB to purchase its propane motor fuel requirements solely from Empire. The contract was to ·last for four years.

AB never ordered any equipment or propane from Empire, deciding not to convert its fleet to propane. Consequently, Empire filed suit, claiming that AB breached the contract by eliminating its requirements. The jury returned a verdict in favor of Empire and awarded damages representing Empire's lost profits on AB's estimated requirements during the contract period.

On appeal, the Seventh Circuit rejected the notion that AB breached the contract simply because it failed to purchase any conversion units or propane from Empire. The court concluded that, pursuant to U.C.C. § 2–306(1), a buyer may "reduce his requirements to zero if he was acting in good faith, even though the contract contained an estimate of those requirements." *Id.* at 1338. Thus, the court determined that Empire could not recover under its contract claim unless the evidence established that AB reduced its requirements in bad faith. *Id.* at 1339.

In reaching this conclusion, the *Empire Gas* court reasoned that the "unreasonably disproportionate" proviso of U.C.C. § 2–306(1) merely explains the term "good faith" with respect to disproportionately *large* demands. *Id.* at 1338. According to the *Empire Gas* court, in promulgating this statute, the drafters of the U.C.C. were concerned that when the market price rose above the contract price, a requirements contract might allow a buyer to increase disproportionately his requirements and resell the product on the open market at a profit. *Id.* The drafters intended the proviso to establish clearly that such actions constituted bad faith. *Id.* However, "there is no indication that the draftsmen were equally, if at all, concerned about the case where the buyer takes less than his estimated requirements, provided, of course, that he does not buy from anyone else." *Id.* Thus, the *Empire Gas* court held that U.C.C. § 2–306(1) does not proscribe unreasonably disproportionate reductions in a buyer's requirements if done in good faith. *Id.*

We find the reasoning in *Empire Gas* persuasive. Accordingly, although no Arizona authority has addressed this issue, we believe Arizona courts would adopt a similar interpretation for Arizona's version of U.C.C. § 2–306(1) (A.R.S. § 47–2306(1)). Thus, we hold that under Arizona law, a requirements contract allows a buyer to reduce the quantity demanded to any amount, including zero, so long as it does so in good faith. If the seller wishes to reallocate some of the inherent risks in such a contract, it may specify some minimum requirement.

Although there is no established standard for determining whether a buyer acted in good faith, courts focus on whether the buyer's reduction of its requirements stemmed

from "second thoughts about the terms of the contract and [the desire] to get out of it." *Empire Gas,* 840 F.2d at 1340–41. Thus, if the buyer "had a legitimate business reason for eliminating its requirements, as opposed to a desire to avoid its contract," the buyer acts in good faith. *NCC Sunday Inserts, Inc.,* 759 F.Supp. at 1009. Although no Arizona authority has addressed this issue, we believe Arizona courts would adopt this general rule.

In the present case, the parties do not dispute Dial's reasons for eliminating the plastic bottle requirements for its Salem, Virginia facility. Specifically, Dial closed this facility as part of its overall restructuring of the Special Business Division. Indeed, because of its low profitability, Dial ultimately closed all but one of the plants within this Division. Thus, Dial's decision to eliminate its requirements did not stem from any desire to avoid its obligations to Brewster, but rather from a legitimate business decision that the Salem plant was unprofitable and should be closed. Under these circumstances, we conclude that Dial eliminated its requirements in good faith. *Cf. Empire Gas,* 840 F.2d at 1339 (Buyer acts in good faith if it eliminates its requirements because of a drop in demand for the buyer's products.).

Thus, although the Contract prohibited Dial from exercising the escape clause until the first anniversary, the Contract did not prevent Dial from eliminating its requirements in good faith. We find this interpretation eminently reasonable. Although the escape clause prohibited Dial from seeking alternative outside suppliers or taking the plastic bottle production "in-house" before the first anniversary of the Contract, the requirements provision allowed Dial to make good faith adjustments to its requirements, including a total elimination of its requirements. Because Dial reduced its requirements in good faith, this action did not breach the Contract.

**D**

■ As alternative theories for relief, Brewster contends that either promissory estoppel or the implied covenant of good faith precluded Dial from terminating the Contract before its first anniversary. Brewster reasons that, because Dial orally consented to Brewster's version of the escape clause during the June 28 and 30, 1988 telephone conversations, Dial cannot terminate the Contract in contravention of oral agreement. We disagree.

Under Arizona law, "promissory estoppel rests upon a promise to do something in the future." *Johnson v. Gilbert,* 127 Ariz. 410, 413, 621 P.2d 916, 919 (App.1980). When this promise creates a justified or reasonable reliance that the promisor will act in the prescribed manner, the promisor becomes obligated to fulfill his promise. Restatement (Second) of Contracts § 90(1). In the present case, Brewster cannot identify any promise by Dial that it would not reduce its requirements during the life of the Contract. Moreover, given that the Contract recognized that Dial was not obligated to purchase any minimum quantity, Brewster's reliance to the contrary would be unjustified. Finally, Brewster's claim that Dial breached the implied covenant of good faith fails in light of our prior conclusion that Dial acted in good faith when reducing its requirements.

**III**

■ Brewster finally contends that the district court erred by failing to discuss its other breach of contract theories. Specifically, in addition to alleging that Dial breached the Contract when it closed its Salem plant, Brewster's complaint also asserted that Dial breached the Contract by:

(1) failing to provide Brewster with efficient molds for the plastic bottles;

(2) purchasing bottles from another supplier during the Contract; and

(3) supplying Brewster with inadequate amounts of resin.

Because the district court's summary judgment order failed to discuss these claims, Brewster contends we must remand the case with instructions for the district court to identify its rationale for dismissing these claims. We agree.

Although Fed.R.Civ.P. 56 does not require a district court to identify its reasons for granting summary judgment, both the Supreme Court and several of our sister circuits have recognized their authority to vacate and remand such orders when the dis-

trict court fails to provide any reasoning for its decision. *See, e.g., Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (vacating and remanding summary judgment because district court's order was "opaque and unilluminating as to either the relevant facts or the law"); *Clay v. Equifax, Inc.*, 762 F.2d 952, 957 (11th Cir.1985); *Van Bourg, Allen, Weinberg & Roger v. N.L.R.B.*, 656 F.2d 1356, 1358 (9th Cir.1981); *Hanson v. Aetna Life and Casualty*, 625 F.2d 573, 575 (5th Cir.1980). These courts generally reason that:

> The unexplained summary judgment order not only denies to the appellate court the tools of review but conceals what the court did and why and leaves the appeals court, like the proverbial blind hog, scrambling through the record in search of an acorn. This is antithetical to proper performance of the review function.

*Clay*, 762 F.2d at 957. Thus, when it is impossible to determine the district court's reasons for granting summary judgment, and the appellate court cannot identify an independent basis for upholding summary judgment from the record, these courts vacate the summary judgment and remand "for entry of reasons in support of the granting of ... summary judgment." *Hanson*, 625 F.2d at 575–76 (quotation omitted).

We find this rule persuasive and equally applicable to the present case. As mentioned, the district court provided no reasons for entering summary judgment in favor of Dial on these contractual theories. Moreover, our review of the record before the district court does not reveal an alternative basis for affirming this portion of the district court's decision. Instead, our review suggests that Brewster's evidence created genuine issues of material fact on these claims.

For example, with respect to Brewster's claim that Dial supplied defective molds, Brewster identified the deposition testimony of Christian Hutter who detailed several defi-

ciencies with the molds Dial supplied to Brewster, and indicated that Dial failed to repair these deficiencies. (Hutter Dep. 7, 10). With respect to Brewster's claim that Dial obtained an outside supplier for plastic bottles, Brewster relied on Dial's Purchase Order, sent to Arriola Plastics on November 23, 1988.[6] In addition, Hutter's deposition also supports Brewster's allegation that Dial supplied inadequate amounts of resin. (Hutter Dep. 22–24). Finally, Brewster asserted that these actions resulted in lost profits either by increasing Brewster's cost of production or by reducing the sales of its plastic bottle reserves. (Hutter Dep. 24–26, 18).

If true, these allegations suggest that Dial breached some of its contractual duties to Brewster. The Change Order indicated that Dial was "responsible for both any major mold repairs necessary and for the replacement of the molds should failure occur." (J.A. 159). In addition, as previously discussed, the Contract precluded Dial from seeking outside suppliers to satisfy its plastic bottle requirements.[7] Finally, the Contract also required Dial to supply Brewster with sufficient amounts of resin to manufacture plastic bottles. While some aspect of Arizona law might preclude Brewster from recovering under these theories, neither Dial's brief to this court nor our independent research has identified any legal impediment to recovery.

In such circumstances, we believe that a remand is necessary "for entry of reasons in support of the granting of ... summary judgment." *Hanson*, 625 F.2d at 575–76 (quotation omitted). After fully reviewing the record on remand, the district court may elect to substantiate its decision on the basis that Brewster's evidence fails to establish genuine issues of material fact. Alternatively, the district court may determine that, even when viewing the facts in the light most favorable to Brewster, Arizona law nonetheless precludes Brewster from recovering un-

---

6. Dial contends that this subsequent Purchase Order did not breach the Contract because it was executed after Brewster ceased manufacturing plastic bottles. However, Hutter's deposition suggests that Brewster had accumulated sufficient plastic bottle reserves to continue supplying Dial until the original cancellation date, December 30, 1988. (Hutter Dep. 15). Thus, this dis-

pute apparently involves a genuine issue of material fact inappropriate for summary judgment.

7. Dial suggests that, because Brewster supplied defective bottles during the Contract, Dial was justified in procuring an outside supplier. However, we cannot resolve this factual issue on summary judgment.

der these contractual theories. We express no opinion on the appropriateness of either alternative.[8]

### IV

For the reasons stated herein, we affirm that portion of the summary judgment holding that Dial's cancellation of the Contract did not amount to a breach. However, we vacate and remand that portion of the summary judgment dismissing Brewster's claims that Dial breached the Contract by: (1) failing to provide Brewster with efficient molds for the plastic bottles; (2) purchasing bottles from other suppliers during the Contract; and (3) supplying Brewster with inadequate amounts of resin. On remand, the district court must clarify its reasons for granting summary judgment on these claims.

*AFFIRMED IN PART, VACATED IN PART AND REMANDED.*

---

8. We note that, on remand, the district court need not conduct additional proceedings or invite additional briefing before elaborating on its reasons for summary judgment, unless it determines such action is necessary.