AFFIRM; Opinion issued December 3, 2012.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-10-00929-CV

KEYES HELIUM COMPANY, Appellant

V.

REGENCY GAS SERVICES, L.P. f/k/a REGENCY GAS SERVICES, L.L.C., ET AL.,
Appellees

On Appeal from the 162nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. 08-08738

# OPINION

Before Justices O'Neill, Richter, and Myers
Opinion By Justice O'Neill

In this U.C.C. breach of contract case, a jury returned an 11-1 verdict in favor of appellee Regency Gas Services, L.P., f/k/a Regency Gas Services, L.L.C. ("Regency"), finding it had not breached its contract with appellant Keyes Helium Company ("Keyes"). The trial court further rendered a directed verdict in favor of Regency on Keyes's unreasonable variation and best efforts claims.

Keyes raises four issues on appeal. It first argues the jury charge improperly defined "good faith" under the U.C.C., which caused the jury to reach an incorrect verdict. Second, the trial court erred by excluding testimony from Keyes's president regarding reasonable standards of fair dealing.

Third, the trial court erred by directing a verdict in favor of Regency on Keyes's unreasonable variation claim. And lastly, the trial court erred by directing a verdict in favor of Regency on Keyes's best efforts claim. We affirm the trial court's judgment.

## Background

The Hugoton Basin spans several states and is the largest and one of the oldest natural gas fields in the country. Both Keyes and Regency have operations in the region. Regency owns a natural gas processing plant in the Hugoton Field area known as the Lakin Plant. Regency is considered a "midstream" company in the oil and gas field, meaning it moves and processes natural gas and associated products like crude helium for its customers. It does not own the products it transports for its customers but gets paid a fee for moving and processing the product for its clients.

Keyes owns a helium processing plant in Oklahoma that refines crude helium into pure helium. Keyes acquires the crude helium from midstream companies like Regency. On August 1, 1996, Keyes entered into a contract for the sale and purchase of crude helium with Regency that forms the basis of this lawsuit.[1] The contract provided that from August 1, 1996 through December 31, 2008, "Seller [Regency] shall sell and Buyer [Keyes] shall purchase all volumes of Crude Helium produced at the Lakin Plant," up to 120 millions of cubic feet in any year. After December 31, 2008, Keyes's purchase obligation was zero.

In 2003, Regency began receiving complaints about the high costs of processing gas at the Lakin Plant from its largest customer, Oxy USA, Inc. ("Oxy"). The contracts between Oxy and Regency were expiring in 2003. Regency had reason to believe, based on discussions with Oxy, that Oxy had better alternatives for processing its gas. Because Oxy accounted for roughly one-third of

---

[1] At the time of the original contract, Regency was CIG Resources Company.

the volume of Regency's system in the Hugoton Field, losing it would result in a thirty percent loss in business. Regency also recognized that losing Oxy would mean the Lakin Plant would be dangerously close to "turndown," which is a term referring to the minimum gas volume required to extract crude helium. After considering its options, and despite its contract with Keyes, Regency decided to close the Lakin Plant and move its gas processing to a nearby plant owned by its competitor, Duke Field Services.

Keyes claimed that despite hearing rumors Duke and Regency were building a pipeline to connect Regency's system to Duke's plant, Regency never told Keyes it planned to shut down the Lakin Plant. Rather, Keyes alleged Regency said it would take care of Keyes and the shutdown was temporary. However, the reality was that shutting down the Lakin Plant meant shutting off crude helium that flowed to Keyes. Essentially, Keyes would lose the main source of its crude helium. Regency shut down the Lakin Plant on August 1, 2005.

Keyes sued Regency for breach of contract claiming that Regency did not act in good faith, that it unreasonably varied from the stated estimates in the contract, and that it did not use its best efforts to supply Keyes with crude helium as required under the contract.

At the conclusion of the jury trial, the court submitted a single liability question asking, "Did Regency fail to comply with the Contract by failing to act in good faith in reducing its output of crude helium to zero at the Lakin Plant?" Included in the definition of "good faith" was whether Regency had a "legitimate business reason for eliminating its output under the Contract." Keyes argued the trial court erred in including the "legitimate business reason" because that strays from "good faith" as defined by the U.C.C.

The jury found in favor of Regency by an 11-1 vote. This appeal followed.

**Exclusion of Expert Testimony**

–3–

In its second issue, Keyes argues the trial court erred by excluding the testimony of its president, David Wilkins, regarding the standards of fair dealing. It argues Wilkins was qualified to provide such testimony based on his experience and training. Regency argues the trial court properly excluded the testimony because (1) Keyes failed to preserve error, (2) Wilkinson was not designated as an expert on reasonable commercial standards of fair dealing, and (3) his testimony was not relevant or probative.

We agree Keyes has failed to preserve its issue for review. Error may not be predicated on a ruling which admits or excludes evidence unless a timely objection appears in the record. *In re commitment of Tolleson*, 09-08-00338-CV, 2009 WL 1474730, at *5 (Tex. App.—Beaumont 2009, no pet.) (mem. op.) (appellant failed to provide record cites to any objections at trial to expert's testimony); TEX. R. APP. P. 33.1(a). While Keyes has provided record cites to its proffer of Wilkinson's testimony, it has failed to provide record cites to any objections at trial, with the trial court's ruling, prior to its offer of proof regarding Wilkinson's testimony as an expert on reasonable commercial standards of fair dealing. This court does not have a duty to review a voluminous record without guidance from the appellant to determine whether its assertion of reversible error is valid. *Most Worshipful Prince Hall Grand Lodge v. Jackson*, 732 S.W.2d 407, 412 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Failure to cite to relevant portions of the record waives appellate review. TEX. R. APP. P. 38.1(i).

Keyes argues it preserved its issue because it properly presented the excluded testimony of Wilkinson in the form of a bill of review. Assuming Keyes properly presented its bill of review, this does not alleviate Keyes of its duty to cite to where in the record it tried to offer Wilkinson's testimony during its case-in-chief and where the trial court excluded it.

We further note that in its brief, Keyes quotes the trial court as stating, "Well, I didn't allow it during your case in chief, and my ruling stands." However, the citation to the record in the brief is only to the trial court's ruling during the offer of proof and not to the case-in-chief. Thus, while the statement may indicate an objection and the trial court's reasoning is somewhere within the voluminous record, we are not required to search for it without guidance.[2] Accordingly, Keyes has failed to preserve this issue for review. We overrule its third issue.

## Jury Charge Error

In its first issue, Keyes argues the trial court erroneously defined "good faith" in the jury charge, and the error probably caused the rendition of an improper verdict. Regency responds the trial court's definition was correct and even if it was erroneous, it is irrelevant under these facts because there is no reversible error based on Keyes's arguments.

The trial court has considerable discretion to determine necessary and proper jury instructions. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 911 (Tex. 2000). When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Id.* at 912. The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a). On the record before us, we agree with Regency that Keyes has failed to establish the definition of "good faith" in the jury charge probably caused the rendition of an improper judgment.

---

[2] However, we question whether an objection and ruling exists in the record because appellate counsel stated during oral argument on rebuttal that it is not captured in the record why Wilkinson's testimony was excluded.

Question 1 asked, "Did Regency fail to comply with the Contract by failing to act in good faith in reducing the output of crude helium to zero at the Lakin Plant?" The charge included the following instruction and definition:

> You may find that Regency failed to comply with the Contract only if you find that Regency's decision to shut down the Lakin Plant was not made in good faith.
>
> "Good faith" means that Regency acted in accordance with commercial standards of fair dealing in making its decisions, including whether Regency had a legitimate business reason for eliminating its output under the Contract, as opposed to a desire to avoid the Contract.

The jury answered "No" to this question. Keyes argues the Uniform Commercial Code defines "good faith" as "honesty in fact and the observance of reasonable commercial standards in fair dealing in the trade." U.C.C. § 2-103(1) (2012). Because this definition was statutory, it contends the trial court's definition of "good faith" should have closely tracked the statute. *See Trinity Fire Ins. Co. v. Kerrville Hotel Co.*, 129 Tex. 310, 321, 103 S.W.2d 121, 126 (1937) ("It is true that ordinarily where the statute defines a legal term the court should confine his charge to the statutory definition."). Instead, Keyes argues that by expanding the definition of "good faith" to include whether Regency had a legitimate business reason for eliminating its output under the contract, the court's submitted charge was erroneous. Accordingly, Keyes argues this led to the rendition of an improper verdict. We disagree.

First, Keyes's argument that the trial court's definition makes "legitimate business reason" equivalent to "good faith" is incorrect. Rather, use of the word "including" in the definition means the jury could consider a legitimate business reason as a factor in Regency's decision to close the

plant. However, the definition does not provide that a "legitimate business reason" is the only consideration for the jury or that good faith is the same as a legitimate business reason.

Further, Keyes has failed to cite to any evidence that Regency's decision to take its output to zero was not made honestly. The evidence Keyes cites is not relevant to the liability question. It argues Regency told Keyes (1) it was "neutral" on crude helium; (2) it would take care of Keyes; (3) it would keep Keyes whole; (4) any shut down of the Lakin Plant would only be temporary; (5) Regency was going to refill the Lakin Plant with other gas; and (6) Regency would work with Duke to make sure Keyes continued to receive streams of crude helium.

Section 4-1-304 of the Colorado Revised Statutes Annotated provides that "every contract or duty within this title imposes an obligation of good faith in its performance and enforcement." COLO. REV. STAT. ANN. § 4-1-304 (West 2012); *see also* U.C.C. § 1-304.[3] However, comment 1 makes it clear that the good faith obligation has to be tied to a particular provision in the contract.

> This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, are medial right or power. This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.

COLO. REV. STAT. ANN. § 4-1-304 cmt. 1.

Here, the contract between Keyes and Regency provided that "Seller shall sell and Buyer shall purchase all volumes of Crude Helium produced at the Lakin Plant." None of the above statements cited by Keyes to support its claim of Regency's alleged dishonesty are tied to its obligation to provide volumes of helium under the contract. Rather, the statements go towards what

---

[3] The underlying Contract provides that "This Agreement, both as to interpretation and performance, shall be governed by the laws of the State of Colorado, without giving effect to its conflict of laws provisions."

Regency allegedly claimed it would do *after* the shutdown of the Lakin Plant. These statements do not support any dishonesty on Regency's part in deciding to shut down the plant. To conclude otherwise would write obligations into the contract that do not exist. Thus, because Keyes has failed to provide any evidence tying the good faith obligation required under section 4-1-304 to a particular contract provision, the trial court's instructions to the jury regarding good faith probably did not cause the rendition of an improper verdict. *See* TEX. R APP. P. 44.1(a). Accordingly, we overrule Keyes's second issue.

## Directed Verdicts in Favor of Regency

In its third issue, Keyes argues the trial court erred by directing a verdict on its unreasonable variation claim because it presented legally sufficient evidence to support it. It contends the plain language of the U.C.C. prohibited Regency from unreasonably reducing the Lakin Plant's output (in this case to zero) from the contract's stated estimates. Regency contends the trial court properly directed a verdict because, as a matter of law, the U.C.C. exception concerning unreasonably disproportionate increases in quantity does not apply to it as a seller under an output contract.

When evidence proves a fact that establishes a party's right to judgment as a matter of law, a directed verdict is proper. *Rogers v. CIGNA Ins. Co. of Tex.*, 881 S.W.2d 177, 186 (Tex. App.—Houston [1st Dist.] 1994, no writ). We review the grant of a directed verdict under well-known standards governing legal sufficiency of the evidence. *See Solares v. Solares*, 232 S.W.3d 873, 883 (Tex. App.—Dallas 2007, no pet.). A directed verdict is proper when a defect in the opponent's pleadings makes them insufficient to support a judgment, the evidence conclusively proves the fact that establishes a party's right to judgment as a matter of law, or the evidence is insufficient to raise an issue of fact. *Byrd v. Delasancha*, 195 S.W.3d 834, 836–37 (Tex. App.—Dallas 2006, no pet.).

The U.C.C. provides the following regarding output and requirements contracts:

(1) A term which measures the quantity by the output of the seller or the requirements of the buyer, means such actual output or requirements as may occur in good faith; except that no quantity unreasonably disproportionate to any stated estimate or, in the absence of a stated estimate, to any normal or otherwise comparable prior output or requirements, may be tendered or demanded.

U.C.C. § 2-306(1) (West 2012); *see also* COLO. REV. STAT. ANN. § 4-2-306(1) (West 2012).

The majority of courts to interpret this portion of the statute and address the issue of whether a party to an output or requirements contract under U.C.C. section 2-306(1) may reduce its output or requirements, even to zero, despite stated estimates in the contract, have concluded a party may do so as long as the reduction is made in good faith. *See Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333 (7th Cir. 1988); *Wiseco, Inc. v. Johnson Controls, Inc.,* 155 Fed. Appx 815 (6th Cir. 2005) (unpublished); *Brewster of Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355 (4th Cir. 1994); *Atlantic Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541 (1st Cir. 1993). Although neither Texas nor Colorado has addressed this issue, Regency urges this Court to follow the majority view and apply it to the present facts. Keyes, however, urges this Court to follow the minority view expressed only by the Supreme Court of Alabama. *See Simcala, Inc. v. Am. Coal Trade, Inc.*, 821 So.2d 197 (Ala. 2001).

The leading and most cited case on this issue is *Empire Gas Corporation v. American Bakeries Company*, 840 F.2d 1333 (7th Cir. 1988). In that case, American Bakeries (AB) sought to convert its fleet of delivery vehicles from gasoline to propane. Consequently, AB executed a contract with Empire Gas (Empire) obligating AB to purchase "three thousand . . . [conversion] units, more or less depending upon [AB's] requirements . . . ." *Empire Gas*, 840 F.2d at 1335. The contract also obligated AB to purchase its propane motor fuel requirements solely from Empire. The contract was to last four years. AB never ordered any equipment or propane from Empire after

deciding not to convert its fleet to propane. Consequently, Empire filed suit, claiming that AB breached the contract by eliminating its requirements. The jury returned a verdict in favor of Empire.

On appeal, the Seventh Circuit rejected the notion that AB breached the contract simply because it failed to purchase any conversion units or propane from Empire. The court concluded that, pursuant to U.C.C. § 2-306(1), a buyer may "reduce his requirements to zero if he was acting in good faith, even though the contract contained an estimate of those requirements." *Id*. at 1338. Thus, the court determined that Empire could not recover under its contract claim unless the evidence established that AB reduced its requirements in bad faith. *Id*. at 1339. In reaching this conclusion, the Empire Gas court reasoned that the "unreasonably disproportionate" proviso of U.C.C. § 2-306(1) merely explains the term "good faith" with respect to disproportionately large demands. *Id*. at 1338.

According to the *Empire Gas* court, in promulgating this statute, the drafters of the U.C.C. were concerned that when the market price rose above the contract price, a requirements contract might allow a buyer to increase disproportionately his requirements and resell the product on the open market at a profit. *Id*. The drafters intended the proviso to establish clearly that such actions constituted bad faith. *Id*. However, "there is no indication that the draftsmen were equally, if at all, concerned about the case where the buyer takes less than his estimated requirements, provided, of course, that he does not buy from anyone else." *Id*. Thus, the Empire Gas court held that U.C.C. § 2-306(1) does not proscribe unreasonably disproportionate reductions in a buyer's requirements if done in good faith. *Id*.

Similar to the majority of courts who have addressed this issue, we find the reasoning in *Empire Gas* persuasive. *See also Brewster*, 33 F.3d 355; *Wiseco, Inc.*, 155 Fed. Appx 815; *Atlantic Track & Turnout Co.*, 989 F.2d 541. Accordingly, although no Colorado authority has addressed

–10–

this issue, we believe Colorado courts would adopt a similar interpretation for Colorado's version of U.C.C. § 2-306(1). *See* COLO. REV. STAT. ANN. § 4-2-306. Thus, we hold that under Colorado law, an output contract allows a seller to reduce the quantity produced to any amount, including zero, so long as it does so in good faith. *See, e.g., Canusa Corp. v. A&R Lobosco, Inc.*, 986 F. Supp. 723, 730 (explaining an output seller is allowed to reduce its output if done so in good faith, regardless of stated estimates in a contract). If the seller wishes to reallocate some of the inherent risks in such a contract, it may specify some minimum requirement.

In reaching this conclusion, we reject Keyes's reliance on *Simcala, Inc. v. American Coal Trade, Inc.*, 821 So.2d 197 (Ala. 2001). Since its publication, no other court has followed its holding.

We likewise reject Keyes's argument that applying Colorado's law of statutory construction would result in a different conclusion. The Colorado General Assembly adopted Colorado's U.C.C. in 1965. *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1212 (Colo. 2008). It acknowledged that one of the purposes in adopting the U.C.C. was to simplify, clarify, and modernize the law governing commercial transactions and "make uniform the laws among jurisdictions." *Id.* Thus, when a Colorado statute is patterned after a model code, as the Colorado statute is after the U.C.C., we may draw upon available persuasive authority in reaching our decision. *Id.; see also West v. Roberts*, 143 P.3d 1037, 1041 (Colo. 2006). Keyes has not provided any persuasive authority that Colorado courts would decide in favor of the minority view announced in *Simcala* when the courts have acknowledged that the purpose in adopting the U.C.C. was to simplify and clarify commercial transactions among jurisdictions. Accordingly, as a matter of law, the trial court did not err by directing a verdict in favor of Regency on Keyes's unreasonable variation claim. We overrule Keyes's third issue.

In its final issue, Keyes contends the trial court erred by granting a directed verdict in favor of Regency on Keyes's best-efforts claim. Regency responds the trial court correctly determined, as a matter of law, the Contract was not an exclusive dealing contract under the U.C.C.; therefore, Regency was not required to use best efforts to supply Keyes with crude helium.

U.C.C. section 2-306(1)-(2) provides the following regarding output, requirements, and exclusive dealings contracts:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer, means such actual output or requirements as may occur in good faith; except that no quantity unreasonably disproportionate to any stated estimate or, in the absence of a stated estimate, to any normal or otherwise comparable prior output or requirements, may be tendered or demanded.

> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

U.C.C. § 2-306(1)-(2) (West 2012); *see also* COLO. REV. STAT. ANN. § 4-2-306(1)-(2) (West 2012).

The contract here provides that "Seller shall sell and Buyer shall purchase all volumes of Crude Helium produced at the Lakin plant." The contract requires Regency to sell all of its output to Keyes; however, the contract does not require Keyes to purchase crude helium exclusively from Regency. When a buyer agrees to buy the seller's entire output of production, it is called an output contract. *See Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 570 (Tex. 1996). Such contracts are governed by U.C.C. section 2-306(1), which does not include the best efforts requirement in U.C.C. section 2-306(2).

However, the contract also appears to involve an exclusive dealings agreement because Regency agreed to exclusively sell crude helium to Keyes. We acknowledge the agreement is not mutually exclusive because Keyes is not required to purchase only from Regency. With this in mind, we consider the application of section 2-306(2).

—12—

While U.C.C. section 2-306(2) applies to exclusive dealing contract, we conclude under these facts the trial court correctly directed a verdict on Keyes's best efforts claim. The "best efforts" doctrine was created to protect the party who is at the complete mercy of another party in an exclusive dealing contract. *Aventis Environ. Science USA, L.P. v. Scotts, Co.*, 383 F. Supp. 2d 488, 505 (S.D.N.Y. 2005) (citing 2-6 Corbin on Contracts § 6.5); *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1125 (3d Cir. 1992) ("The obligation to use best efforts to resell a product is imposed upon those buyers engaged in 'exclusive dealing in the kind of goods concerned . . . .'").

On its face, courts have noted this provision could be interpreted to mean that any party to such a contract has an implied obligation to use best efforts. *See MDC Corp., Inc.*, 228 F.Supp.2d at 392. However, comment 5 of section 2.306(2) indicates the duty to use best efforts applies only to those who receive the benefit of an exclusive commitment. *See* U.C.C. § 2.306 cmt. 5 ("Under such contracts the exclusive agent is required, although no express commitment has been made, to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be."). Here, Regency was at the complete mercy of Keyes because it agreed to sell all its output of crude helium only to Keyes. It could not attempt to sell its product to others, whereas, Keyes could take all of Regency's product and still seek out crude helium from other resources. As such, Keyes was in the position of receiving the benefit from the exclusive commitment. Thus, the obligation of best efforts was not on Regency. *Id.*

Although Keyes argues "when constructing its business model and its marketing for its purified helium," it is just as entitled "to rely on Regency's obligation to use its best efforts to draw from the gas stream and furnish the crude helium," it has not provided authority to support a different interpretation of section 2-306(2). Accordingly, we conclude Regency established as a matter of law

that Keyes's best efforts claim under section 2-306(2) fails, and the trial court properly granted a directed verdict in favor of Regency. We overrule Keyes's final issue.

## Conclusion

The judgment of the trial court is affirmed.

MICHAEL J. O'NEILL
JUSTICE

100929F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

KEYES HELIUM COMPANY, Appellant

No. 05-10-00929-CV      V.

REGENCY GAS SERVICES, L.P. F/K/A
REGENCY GAS SERVICES, L.L.C., ET
AL., Appellees

Appeal from the 162nd Judicial District
Court of Dallas County, Texas. (Tr.Ct.No.
08-08738).
Opinion delivered by Justice O'Neill,
Justices Richter and Myers, participating.

     In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.  It is **ORDERED** that appellee Regency Gas Services, L.P. f/k/a Regency Gas
Services, L.L.C., et al. recover their costs of this appeal from appellant Keyes Helium Company.


Judgment entered December 3, 2012.


MICHAEL J. O'NEILL
JUSTICE