**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PINE STATE CREAMERY COMPANY,
Plaintiff-Appellee,

v.                                                             No. 98-2441

LAND-O-SUN DAIRIES, INCORPORATED,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-96-170-5-BO, BK-93-536-6-ATS, AP-95-165-5-S)

Argued: May 5, 1999

Decided: December 2, 1999

Before ERVIN,* WILKINS, and KING, Circuit Judges.

_____

Vacated and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Monroe David Bryant, HUGHES & LUCE, L.L.P., Dal-
las, Texas, for Appellant. Lacy Martin Presnell, III, David Warren
Boone, BURNS, DAY & PRESNELL, P.A., Raleigh, North Carolina,
for Appellee. **ON BRIEF:** James W. Hryekewicz, HUGHES &

_____

*Judge Ervin heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel pursuant to 28 U.S.C. § 46(d).

LUCE, L.L.P., Dallas, Texas; Robert E. Fields, III, Bonnie Kay Donahue, Christine Sandez, WOMBLE, CARLYLE, SANDRIDGE & RICE, Raleigh, North Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Land-O-Sun Dairies, Inc., appeals the district court's grant of summary judgment to Pine State Creamery Company in this adversary proceeding commenced within the context of Pine State's Chapter 11 bankruptcy. In its Amended Complaint, Pine State alleged that Land-O-Sun breached, without justification, a written agreement to purchase Pine State's Raleigh, North Carolina dairy plant. Because the conflicting evidence reveals a genuine issue of material fact, i.e., the materiality of the reason proffered by Land-O-Sun for reneging on the purchase agreement, we vacate the judgment of the district court and remand the case for trial.

I.

A.

In August 1995, Flav-O-Rich, Inc., a regional producer and distributor of dairy products, entered into negotiations with Pine State (which had been operating in bankruptcy for about two years) for the purchase of Pine State's dairy plant and certain related assets. On October 1, 1995, Flav-O-Rich was itself acquired by Land-O-Sun, a Delaware corporation with its principal place of business in Johnson City, Tennessee; two days later, Land-O-Sun agreed in principle to the Pine State deal, for which it proposed to pay in excess of $3 million.

2

Lawyers for the parties drafted an "Asset Purchase Agreement" ("APA"). Section 1.39 of the APA specified the assets that would be sold: customer lists and distribution routes; inventories of finished products; machinery and equipment; goodwill and other intangibles; intellectual property, such as patents and trademarks; and everything else used in running Pine State's business, including the processing plant -- but excluding cash, receivables, utility deposits, real estate, and all non-business assets. The terms of the APA contemplated that the deal would close on November 30, 1995.

Articles V and VI of the APA set forth certain warranties and representations made by Pine State and Land-O-Sun, respectively, in connection with the deal. Section 5.3 provided that Pine State's balance sheet as of September 30, 1995, and monthly earnings statements for the entire year would be attached as a Schedule to the agreement. These reports were required to "fairly present[ ] the financial position of [Pine State] and the results of its operations and changes in its financial position . . . ."

In Section 5.13, Pine State warranted that, dating from September 30, 1995, there had been no "material adverse change in the business, financial condition, results of operations or assets or liabilities of the Business . . . ." In return, Land-O-Sun gave its assurances in Section 6.5 that it had "undertaken such investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to this Agreement, and . . . has relied solely upon its own investigation analysis and . . . upon the representations and warranties contained in this Agreement . . . ."

Land-O-Sun's obligation to close the deal was subject to the fulfillment of the conditions precedent outlined in Article VIII, including Section 8.3, providing an escape in the event of"any material adverse change in the Business"; and Section 8.8, imposing a continuing duty on Pine State to ensure that its warranties and representations remained "true and correct in all material respects" as of the closing date. In addition, Section 10.1(c) permitted Land-O-Sun to terminate the APA at any time prior to closing, "if there has been a material violation or breach by [Pine State] of any agreement, representation or warranty contained in this Agreement which is not curable . . . ."

3

B.

Allen Meyer, the Chief Executive Officer of Land-O-Sun, signed the APA on October 31, 1995; Pine State's president, Ben Kilgore IV, affixed his signature the following day. At the time of his signing, Meyer did not have access to Pine State's financial reports for September, which were supposed to have been attached pursuant to Section 5.3. Attached instead were Pine State's reports for August; they had been telecopied to Land-O-Sun's lawyers on October 23 with the note that Pine State was "currently in the process of closing" September. The August reports showed an operating profit for the month of about $41,000, and a year-to-date profit of approximately $44,000.

The September reports told a different story. Rather than operating at a small profit, it was revealed that Pine State had lost more than $212,000 for the year. Most of the $256,000 loss attributed in September -- over $200,000 -- was the result of accounting and billing errors that had accumulated over the previous one to three months; had the August reports been accurate, they would have shown a year-to-date loss of more than $150,000.

Pine State neglected to forward the September reports to Land-O-Sun until November 21, when they did so in response to a request by one of Land-O-Sun's attorneys. On November 27, Loren White, Land-O-Sun's Chief Financial Officer, flew from Johnson City to Raleigh at Meyer's request to meet with Pine State's representatives concerning the company's financial situation. By then, the October reports were available, and they reflected an operating loss for that month of an additional $156,000. The next day, Meyer informed Kilgore in writing that Land-O-Sun was terminating the APA, based on "a material adverse change in the business which we thought we were acquiring." J.A. 514.

Pine State continued to lose money, finishing the year over $700,000 in the red. On the heels of the failed transaction, Pine State filed an adversary proceeding in the bankruptcy court against Land-O-Sun, alleging that Land-O-Sun had breached the APA. Land-O-Sun answered and filed a counterclaim for misrepresentation. On June 15, 1996, Pine State ceased its operations. It ultimately disposed of its operating assets for about $400,000.

4

Following discovery, Land-O-Sun moved for summary judgment; that motion was denied by the bankruptcy court on June 11, 1997, and the case was sent to the district court for a jury trial. At a motions hearing on November 24, 1997, the district court indicated its belief that the case presented no triable matter. On December 24, 1997, after considering memoranda from the parties regarding the materiality of the information contained in the September and October 1995 financial reports, the district court entered summary judgment for Pine State; the court ruled that, as a matter of law, Land-O-Sun had breached the APA without justification. The district court concomitantly denied Land-O-Sun any relief on its counterclaim.

During the next several months, the district court received evidence of Pine State's damages. On August 25, 1998, the court denied Land-O-Sun's motion for reconsideration of its earlier order as to liability, and it entered summary judgment on behalf of Pine State for approximately $2.77 million, plus interest and an attorney fee award of fifteen percent. Land-O-Sun appeals.

II.

A.

Summary judgment is appropriate only in those cases where the pleadings and responses to discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). We review a district court's grant of summary judgment de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988).

A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In this regard, the party opposing the motion for summary judgment "is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts . . . resolved favorably to him." Brewster of Lynchburg, Inc. v. Dial Corp., 33 F.3d 355, 361 (4th Cir. 1994)

5

(quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)) (alterations in original) (internal quotation marks omitted).

B.

1.

Pursuant to the parties' agreement, embodied in Section 13.10 of the APA, the substantive law of North Carolina governs this dispute. Under North Carolina law, the materiality of a contractually imposed obligation -- such that failure to perform the obligation justifies rescission of the contract -- is a question of fact. Opsahl v. Pinehurst, Inc., 344 S.E.2d 68, 74 (N.C. Ct. App. 1986) (citing Combined Ins. Co. of Am. v. McDonald, 243 S.E.2d 817, 820 (N.C. Ct. App. 1978)). In "appropriate cases," the court may determine materiality as a matter of law. McDonald, 243 S.E.2d at 820. Consistent with the summary judgment standard, an "appropriate case" would be one in which the evidence is so one-sided as to create no genuine issue for a jury to resolve.

The specific question in this case is whether, at the time the APA was signed, the parties contemplated that a sudden downturn in Pine State's profitability would be a material factor in Land-O-Sun's decision to follow through with the purchase one month later. If this question is answered in the affirmative, then it must be concluded that Land-O-Sun legitimately refused to close the deal for failure of the condition precedent outlined in Section 8.3 of the APA -- that the Business shall not have suffered "any material adverse change." Alternatively, Land-O-Sun could have properly terminated the APA under Section 10.1(c) because Pine State had warranted in Section 5.13 against "any material adverse change in the business, financial condition, results of operations or assets or liabilities of the Business . . . ."**1**

_____

**1** Pine State contends that the term "Business" should be construed to mean only the physical processing plant and the customer routes; inasmuch as these assets themselves suffered no material adverse change following the signing of the APA, Pine State maintains that neither Section 8.3 nor Section 10.1(c) could provide Land-O-Sun with a reason to

6

Neither Section 8.3 nor Section 10.1(c) define, by example or otherwise, what is meant by a "material" adverse change. To a significant extent, it can be discerned from the language and structure of the contract itself whether a particular occurrence is material.**2** Often, however, it is necessary to resort to extrinsic evidence to ascertain the precise intent of the parties. Opsahl, 344 S.E.2d at 74. In North Carolina, "[p]arol evidence generally is admissible to show grounds for granting or denying rescission even if the written agreement includes a merger clause." Id. at 75 (citation omitted).**3**

_____

rescind the contract. Pine State bases its argument on this Recital in the preamble to the APA:

> A. Seller owns and operates a dairy processing plant under the name "Pine State Creamery" at Raleigh, North Carolina (the "Plant") and operates a wholesale dairy distribution system (the "Routes") through which dairy products produced at the Plant are sold (collectively, the "Business")[.]

We agree that, in a broad sense, the plant and the routes constitute the Business, but the Recital plainly refers to Pine State's operation of both; it also mentions the production of goods, placing the plant in the context of something more than four walls, a floor, and a ceiling. Indeed, a customer "route" has little value other than as an outlet for the sale of goods produced as the result of operations. Under the circumstances, and especially in light of Section 10.1(c)'s separate reference to "results of operations . . . of the Business" (which would make little sense if it referred only to a building or to a path along which customers happened to be located), we conclude that Pine State's financial activities are fairly included within the term "Business," as defined by the APA.

**2** Indeed, that was primarily the approach taken by the court in McDonald: "Here, the clear intent of the parties to the contract, as expressed therein, and the stipulated fact of the defendant's employment with another company within two days, constituted evidence of the parties' intent that the notice of termination provision not be deemed material." McDonald, 243 S.E.2d at 820 (emphasis added). The court nonetheless noted that its conclusion regarding materiality "was also amply supported by other evidence before the trial court." Id.

**3** The APA contains just this sort of "merger clause" in Section 13.1:

> This Agreement . . . set[s] forth the entire understanding of the parties and supersede[s] any and all prior or contemporaneous agreements, arrangements and understandings relating to the subject matter hereof, and the provisions hereof may not be changed, modified, waived or altered except by an agreement in writing signed by the parties hereto.

7

In accordance with the legal principles expressed above, we now examine the evidence in this case to determine whether it gives rise to a genuine issue regarding the materiality of Pine State's continued profitability in the months prior to the scheduled closing. If no such genuine issue exists, then the district court correctly identified this matter as an "appropriate case" for disposition as a matter of law, and its judgment ought to be affirmed.

2.

The language and structure of the APA indicates that the parties considered Pine State's profitability to be material to the culmination of the sale. Section 5.3 provided for the attachment of a Schedule comprised of Pine State's balance sheet as of September 30, 1995, along with the company's monthly statements of earnings for the entire year. By operation of Section 13.6, this Schedule was incorporated into the parties' agreement.

The financial statements were to be prepared, insofar as possible, "in accordance with generally accepted accounting principles," so as to fairly present "the financial position of[Pine State], <u>and the results of its operations and changes in its financial position</u> . . . ." (emphasis added). And, as we have already noted, Section 5.13 required Pine State to warrant that, for the period commencing October 1, 1995, there had been no significant change for the worse in its financial condition or results of operations.

It is difficult to imagine why the parties would go to the trouble of integrating Pine State's financial reports into the APA had they not intended that Land-O-Sun should rely on them in deciding to close the purchase. Of course, the mere fact of inclusion does not render every provision, clause, or schedule essential to the underlying agreement, else the concept of materiality would have little meaning. Nonetheless, where the parties have undertaken not only to include particular information, but also to ensure its initial accuracy and guarantee its ongoing validity, common sense dictates that the information is quite possibly pertinent to a foundational assumption upon which the desire to contract is premised.

Our hypothesis is borne out in this case by CEO Meyer's deposition testimony. By the time of his participation in the Pine State trans-

8

action on behalf of Land-O-Sun, Meyer had been personally involved in thirty-five dairy acquisitions. With regard to the financial reports referenced in the APA, Meyer stated:

> Any acquisition I've looked at . . . I've either had information given to me or someone may have given me [a] representation, but this [the information contained in financial statements] is the . . . financial condition of the company. We've always, then, relied on what the representations have been in the agreement . . . and you can look at all these acquisitions, and I've never had a situation where that hasn't been the case.

J.A. 609. According to Meyer, he became alarmed upon learning that the September 1995 financial reports were inconsistent with his belief that Pine State was continuing to operate on at least a break-even basis.

In contrast, Pine State points out that the APA was, after all, nothing more than an agreement to purchase certain of the dairy's assets; it was not a proposal whereby Land-O-Sun would simply assume Pine State's management role in an attempt to operate the business as a going concern. Considering the nature of the transaction at issue, the argument goes, Land-O-Sun was necessarily far more concerned with how it would operate its own business using the acquired assets than with Pine State's bottom line.

To bolster its position, Pine State notes that its losses in 1995 were similar to those in the years immediately prior, all of which were a matter of record in the bankruptcy proceedings. Meyer, moreover, decided to sign the APA before the September 1995 financial reports were made available, notwithstanding their prominence by specific mention in Section 5.3. Finally, the deposition testimony of Meyer and others reveals that Land-O-Sun may not have conducted its "due diligence" -- pursuant to Section 6.5 of the APA -- in a particularly diligent manner, perhaps indicating that Land-O-Sun was relatively unconcerned with how profitably Pine State was operating its business.

We cannot agree with Pine State that the ongoing financial results of its operations were irrelevant to maintaining Land-O-Sun's interest

9

in acquiring it; indeed, such a contention belies the plain import of the language and structure of the APA. Rather, the financial viability of Pine State was at the essence of the contract -- it is simply a question of degree regarding the point that Pine State's operating losses would become "material." Had Pine State operated at a small loss during the autumn of 1995, that eventuality would surely have been within the contemplation of Land-O-Sun; it undoubtedly was acquiring Pine State in the belief that it could turn the dairy's fortunes around. Conversely, had Pine State lost millions during the same period, Land-O-Sun could have readily concluded that the business was a lost cause.

Whether an operating loss of more than $400,000 during a two-month period amounts to a "material adverse change," however, presents a considerably closer question. Although such a downturn appears substantial at first blush, James D. Vick, Pine State's Vice-President of Finance during the acquisition negotiations, testified at deposition that his company's business was seasonal. Vick explained that sales were generally at their highest point during the summer, but would plunge severely in the autumn.

Under the circumstances, we cannot say that Pine State's operating losses were material as a matter of law. Instead, the facts of this case create a genuine issue as to the materiality of Pine State's losses in September and October 1995 with respect to Land-O-Sun's obligations under the APA. Far from being an "appropriate case" for summary disposition, this dispute centers on a question that is properly submitted for decision by a jury that has been given a full opportunity to carefully consider and evaluate the conflicting evidence.

III.

In accordance with the foregoing, the judgment of the district court is vacated, and this case is remanded for trial.

VACATED AND REMANDED

10