

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00240-CV

**IN THE INTEREST OF R.L.L. III** and A.L.L., Children

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2016PA02373
Honorable Peter Sakai, Judge Presiding[1]

Opinion by:     Marialyn Barnard, Justice

Sitting:           Marialyn Barnard, Justice
                     Rebeca C. Martinez, Justice
                     Irene Rios, Justice

Delivered and Filed: November 21, 2018

AFFIRMED

This is an appeal from an order terminating appellant mother's ("Mother") parental rights to her children, R.L.L. III and A.L.L.  On appeal, Mother contends: (1) her due process rights were violated based on several actions taken by the trial court; and (2) the evidence is legally and factually insufficient to establish the grounds for termination or that termination was in the children's best interests.  We affirm the order of termination.

---

[1] The Honorable Angelica Jimenez is the presiding judge of the 408th District Court, Bexar County, Texas.  The Honorable Charles Montemayor, Associate Judge, signed the original termination order.  However, the original termination order was reviewed de novo by the Honorable Peter Sakai, presiding judge of the 225th Judicial District Court, Bexar County, Texas, who rendered the order of termination that is the subject of this appeal.

**BACKGROUND**

In March 2016, the Texas Department of Family and Protective Services ("the Department") became involved with the family based on allegations of drug abuse and neglectful supervision. More specifically, it was reported that Mother was abusing methamphetamines and neglecting the children by leaving them in their car seats while she engaged in drug use and locking them in a bathroom for twelve hours with methamphetamines and syringes. At the time of the initial allegations, R.L.L. was two years old and A.L.L. was a one-year-old infant. Initially, the matter was a family-based case, but because of Mother's continued drug use and failure to complete any services — inpatient drug treatment, parenting and domestic violence classes, the Department filed a petition in October 2016 to terminate her parental rights.[2]. Mother's children, then ages three and two, were removed and placed with a foster family. R.L.L. showed aggression toward the foster family's special-needs daughter, as well as the foster mother. The placement lasted less than a month. After a short placement in respite care, the boys were placed with a maternal aunt, L.W., and uncle, but R.L.L. again displayed anger issues and was sent to a facility — Clarity — for treatment on several occasions while he resided with his aunt and uncle. Although A.L.L. remained with his aunt and uncle, R.L.L. did not return to the home after his third stay at Clarity. Officials at Clarity recommended he not return to the home of his aunt and uncle. The Department found R.L.L. an emergency placement at K Star, where he had issues with the female director. Thereafter, he was placed in a therapeutic foster home with C.A. Ultimately, in August 2017, R.L.L. was placed with M.B. and his husband; A.L.L. was placed in the same home less than three months later. At the time of trial in December 2017, both boys, who were then ages four and three, remained with M.B. and his husband.

---

[2] The Department also sought to terminate Father's parental rights, and his rights were terminated. However, Father did not file a notice of appeal challenging the termination. Accordingly, he is not a party to this appeal.

The Department created a service plan for Mother. Pursuant to the service plan, Mother was required to, among other things: (1) engage in individual counseling; (2) complete a drug assessment and abide by recommendations made as a result of the assessment, including inpatient drug therapy; (3) attend classes on domestic violence and parenting; (4) maintain stable employment and housing; and (5) submit to random drug tests, including urinalysis and hair follicle screenings. The trial court ordered her to comply with each requirement set out in the plan. During the course of this matter, the trial court held the statutorily required status and permanency hearings, and ultimately, the matter moved to a final hearing before an associate judge.

At the final hearing, which was held over the course of five days, the associate judge heard testimony from more than a dozen witnesses, including Mother. Ultimately, the associate judge rendered a termination order in which he found Mother: (1) knowingly placed or allowed her sons to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed her children with people who engaged in conduct that endangered their physical or emotional well-being; (3) failed to comply with a court order that established the actions necessary for her to obtain the return of her sons; and (4) used a controlled substance in a manner that endangered the health of safety of her sons and failed to complete a court-ordered drug treatment program. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P). The trial court further found termination of Mother's parental rights would be in the best interests of her children. *See id.* § 161.001(b)(2). Thereafter, Mother timely requested a de novo hearing. *See id.* § 201.015(a)(1) (stating party may request de novo hearing before referring court by filing written request for same not later than third working day after date party receives notice of substance of associate judge's report).

At the de novo hearing, the trial court took judicial notice of, and admitted into evidence, the reporter's record for the hearing conducted by the associate judge. In addition, the trial court

heard testimony from three witnesses, including Mother. At the conclusion of the de novo hearing, the trial court took the matter under advisement. Subsequently, the trial court rendered its own termination order, finding Mother's parental rights should be terminated on the grounds that she: (1) knowingly placed or allowed her sons to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed her children with people who engaged in conduct that endangered their physical or emotional well-being; (3) used a controlled substance in a manner that endangered the health of safety of her sons and failed to complete a court-ordered drug treatment program. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (P). Unlike the associate judge, the trial court did not find Mother's rights should be terminated based on her failure to comply with a court order that established the actions necessary for her to obtain the return of her sons. *See id.* § 161.001(b)(1)(O). The trial court also determined termination of Mother's parental rights would in the best interests of the children. *See id.* § 161.001(b)(2). Mother perfected this appeal.

## ANALYSIS

On appeal, Mother first contends her due process rights were violated based on certain actions by the associate judge. Second, Mother contends the evidence is legally and factually insufficient to support the trial court's findings under sections 161.001(b)(1)(D), (E), and (P) of the Texas Family Code ("the Code"). *See id.* § 161.001(b)(1)(D), (E), (P). Finally, Mother challenges the legal and factual sufficiency of the evidence in support of the trial court's finding that termination was in the best interests of her sons. *See id.* § 161.001(b)(2).

### *Violation of Rights to Due Process*

As noted above, Mother contends her due process rights were violated. Specifically, she argues her due process rights were violated when the associate judge: (1) denied her request to retain counsel prior to commencement of trial, (2) made remarks indicating it could not be fair and

impartial, and (3) failed to complete the trial in a timely manner. We consider each contention in turn.

### *Mother's Due Process Rights Violated by Denial of Request to Retain Counsel*

Mother first contends the associate judge violated her due process rights when he denied her "request to retain counsel prior to the commencement of trial." She argues that "[i]t is clear from the record that [Mother's] court appointed counsel attempted to withdraw because [Mother] desired to retain counsel." Based on our review of the record, Mother's contention is incorrect.

Immediately before the final hearing was to begin, Mother's court-appointed attorney announced "not ready," advising the court that Mother had been arrested the previous night. Counsel then stated:

> I would also like to make an oral motion before the Court that I be removed from the case at [Mother's] request. She has requested that she get another attorney, and I wanted to put that before the Court, as well, in her absence.

In response, the associate judge advised that Mother's attempt to discharge current appointed counsel would create delay "in that a new counsel would have to be appointed." He noted that court-appointed counsel had been her "usual diligent self[,] working hard." There was no indication during the exchange that Mother was no longer indigent and desired to retain counsel of her own choosing. Rather, the colloquy between the associate judge and Mother's counsel suggests Mother desired to have new counsel *appointed*. Counsel did not disabuse the associate judge of his belief that she was requesting to withdraw and have new counsel appointed for Mother.

We hold Mother's contention that the associate judge denied her right to due process for failing to allow her to retain counsel of her choice has not been preserved for our review. First, the record does not establish that Mother asked that she be permitted to *retain* counsel of her choosing or that she had the ability to do so at the time counsel made the oral motion. When the associate judge discussed the matter with counsel on the record, he specifically referenced

appointment of new counsel. Mother's appointed counsel made no reference to retention of counsel or any statement to that effect. Thus, Mother's request was not sufficiently specific to make the trial court aware of her complaint, and the grounds were not apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1)(A). Additionally, Mother's request below does not comport with her complaint on appeal — requesting withdrawal of current appointed counsel and substitution of new appointed counsel versus requesting withdrawal of current appointed counsel and being given leave to find new retained counsel — thereby waiving appellate review. *See In re J.N.*, No. 05-14-00558-CV, 2014 WL 4978656, at *2 (Tex. App.—Dallas Oct. 7, 2014, pet. denied) (mem. op.).

Finally, even a complaint that a party's due process rights have been denied must be preserved by a proper objection or request. *See In re C.J.P.*, No. 09-15-00370-CV, 2016 WL 240793, at *2 (Tex. App.—Beaumont Jan. 21, 2016, no pet.) (mem. op.); *In re G.T.*, No. 04-16-00436-CV, 2016 WL 7445037, at *1-*2 (Tex. App.—San Antonio Dec. 28, 2016, no pet.) (mem. op.); *J.S. v. Tex. Dep't of Family and Protective Servs.*, 511 S.W.3d 145, 156 (Tex. App.—El Paso 2014, no pet.); *In re J.N.*, 2014 WL 4978656, at *2. Mother did not, at any time in the courts below — either during the final hearing before the associate judge nor before the trial court during de novo review — make a constitutional objection or otherwise make either court aware that she was raising a due process claim based on the trial court's failure to allow her to obtain retained counsel. Rather, before the associate judge, counsel for Mother merely announced not ready due to Mother's arrest and then stated Mother had requested that "she get another attorney." At the de novo hearing, when the trial court noted Mother had new counsel, the new attorney merely confirmed his appearance and substitution. He did not raise a complaint about a denial of Mother's due process rights based on Mother's request for "another attorney" before the final hearing in front of the associate judge. Thus, we hold Mother has not preserved her due process complaint

for appellate review. *See In re C.J.P.*, 2016 WL 240793, at *2; *In re G.T.*, 2016 WL 7445037, at *1-*2; *In re J.N.*, 2014 WL 4978656, at *2.

It appears, however, that Mother may also be raising a claim of ineffective assistance of counsel.[3] Specifically, she contends her court-appointed counsel was deficient in that she failed to: (1) call Mother to testify; and (2) introduce into evidence copies of Mother's certificates of completion, employment records, housing record, or negative drug test results.

The Texas Supreme Court held that in reviewing a claim of ineffective assistance of counsel in a parental termination case, appellate courts are to follow the two-pronged analysis set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003). Under *Strickland*, the parent who complains about trial counsel's deficient performance must first show counsel's performance was deficient. *In re M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 687). This mandates that the parent show counsel made errors so serious that counsel was not functioning as the type of effective counsel mandated by the Sixth Amendment. *Id.* In addition, a parent must show trial counsel's deficient performance prejudiced the parent's case. *Id.* This requires a showing that the errors committed by counsel were so serious that they deprived the parent of a fair trial. *Id.* The burden is on the parent to establish both prongs by a preponderance of the evidence. *See id.*

In this case, we hold Mother has failed to establish the second prong. As noted above, after the associate judge rendered its termination order, retained counsel for Mother appeared and timely filed a request for de novo review. At the de novo hearing, Mother's retained counsel called her as a witness and caused to be admitted into evidence Mother's certificates of completion,

---

[3] In her brief, Mother states "[t]he effect of the trial court's action was to deprive [her] of effective assistance of counsel."

employment records, housing record, and drug test results.[4] As this court has recognized, "[a] de novo hearing 'is a new and independent action' on the issues raised by the party requesting the hearing." *In re C.O.*, No. 04-17-00175-CV, 2018 WL 1733178, at *2 (Tex. App.—San Antonio Apr. 11, 2018, no pet.) (mem. op.) (quoting *In re R.R.*, 537 S.W.3d 621, 622 (Tex. App.—Austin 2017, no pet.); *In re A.B.*, No. 04-11-00741-CV, 2012 WL 2126887, at *1 (Tex. App.—San Antonio June 13, 2012, no pet.) (mem. op.)). "In other words, 'it begins an entirely new process' as to the issues being raised." *In re C.O.*, 2018 WL 1733178 at *2 (quoting *Att'y Gen. v. Orr*, 989 S.W.2d 464, 467–68 (Tex. App.—Austin 1999, no pet.)); *see In re A.A.T.*, No. 13–16–00269–CV, 2016 WL 8188946, at *2 (Tex. App.—Corpus Christi Aug. 25, 2016, no pet.) (mem. op.) (characterizing de novo hearing as having all attributes of original civil action to extent of issues raised therein). The record from the de novo hearing establishes Mother's retained counsel raised issues challenging the grounds for termination found by the associate judge, as well as his best interest finding. In essence, the issues before the trial court were the same as those before the associate judge, and Mother was permitted to admit all of the evidence she claims her appointed counsel failed to introduce — her testimony, certificates of completion, housing records, employment records, and favorable drug test results. Thus, we hold Mother has failed to establish the errors allegedly committed by appointed trial counsel were so serious that they deprived the Mother of a fair trial. *See In re M.S.*, 115 S.W.3d at 545.

---

[4] We note that although Mother's appointed trial counsel did not "call" her as a witness in her case-in-chief, the Department called Mother as a witness and Mother's appointed trial counsel examined Mother, having her testify to the classes she completed, her current housing and employment, and favorable drug test results. Thus, it does not appear that appointed trial counsel's performance at the final hearing before the associate judge was deficient under *Strickland*. *See In re M.S.*, 115 S.W.3d at 545.

*Mother's Due Process Rights Violated by Associate Judge's Remarks*

In her second appellate complaint, Mother contends her rights to due process were violated when the associate judge made comments about Mother's conduct throughout the course of the case, and thereafter, did not sua sponte recuse himself from the matter. Specifically, Mother complains about statements made by the associate judge in response to the "not ready" announcement made by her counsel, which was based in part on Mother's arrest the prior evening, as well as Mother's eleventh-hour attempts to complete her service plan[5]:

> "Okay. We're going to go forward. The issue with attorney, just to be frank, Ms. Miles [Mother's attorney], and I appreciate your candidness and honesty with the Court, but indications from past permanency and status hearings is there's incredible instability.
>
> In fact, my notes from July 20th indicate the major issues with mom were instability issues that were mainly by her. She had a very late start. There's not engagement early. And, frankly, the arrest yesterday is just a culmination of the chaotic, dysfunctional life that I've heard about in the permanency hearings. So I'm not sure that's accurate, and we'll weigh the evidence and see, but that's somewhat indicative of what we've heard in prior hearings.

Mother contends these statement by the associate judge rendered him unable to act fairly or impartially, mandating that he recuse himself.

As set out above, an allegation that a party's due process rights have been violated are waived if not preserved by proper objection or request. *See In re C.J.P.*, 2016 WL 240793, at *2; *In re G.T.*, 2016 WL 7445037, at *1-*2; *In re J.N.*, 2014 WL 4978656, at *2. Mother did not

---

[5] Mother also states the associate judge "further made remarks that it did not believe its view would change even after testimony and evidence was presented." However, Mother provides no record citations for these "further remarks," and the reporter's record from the final hearing before the associate judge includes five volumes of testimony totaling more than four hundred pages. It is not the responsibility of the appellate court to search the record without guidance from an appellant to determine whether her complaints are valid. *E.g., Neira v. Scully*, No. 04-14-00687-CV, 2015 WL 4478009, at *1 (Tex. App.—San Antonio July 22, 2015, no pet.) (mem. op.); *Mullendore v. Muehlstein*, 441 S.W.3d 426, 430 (Tex. App.—El Paso 2014, pet. abated). The Rules of Appellate Procedure requite that an appellant's brief contain citation to the record, and a failure to include such citations waives error. *Neira*, 2015 WL 4478009, at *1 (citing *Keyes Helium Co. v. Regency Gas. Servs., L.P.*, 393 S.W.3d 858, 861 (Tex. App.—Dallas 2012, no pet.)); *see* TEX. R. APP. P. 38.1(i). Accordingly, we will not perform an independent review of the record to find the "further remarks" referenced by Mother. Rather, we will review the issue based on the remarks pointed out and supported by record citations in the brief.

lodge an objection to the associate judge's statements on due process or any other grounds. Moreover, Mother never asked that the associate judge recuse himself based on his remarks. *See In re R.A.*, 417 S.W.3d 569, 582 (Tex. App.—El Paso 2013, no pet.) (holding grounds for recusal of judge can be waived if not raised by proper motion under Rule 18 of the Texas Rules of Civil Procedure) (citing *In re Union Pac. Res. Co.*, 969 S.W.2d 427, 428 (Tex. 1998)); *Esquivel v. El Paso Healthcare Sys., Ltd.*, 225 S.W.3d 83, 88 (Tex. App.—El Paso 2005, no pet.) (holding party who fails to file motion that complies with Rule 18a waives right to complain of judge's refusal to self-recuse); *Spigener v. Wallis*, 80 S.W.3d 174, 180 (Tex. App.—Waco 2002, no pet.) (holding recusal error waived if not raised by proper motion). We therefore hold Mother has failed to preserve this complaint for our review.

*Mother's Due Process Rights Violated Because Final Hearing Not Promptly Completed*

Finally, with regard to her due process claims, Mother contends her due process rights were violated when the associate judge failed to complete the final hearing "in a timely manner." Mother points out that although the final hearing began within the time limit set forth in section 262.401(a) and (b) of the Code, the multiple resets unreasonably delayed the case for several months. *See* TEX. FAM. CODE ANN. § 262.401(a), (b) (stating that in termination instituted by Department, trial court must commence trial on merits on first Monday after first anniversary of date court rendered temporary order appointing Department as temporary managing conservator or jurisdiction is terminated unless trial court finds extraordinary circumstances necessitate child remaining in temporary managing conservatorship of Department and it is in best interest of child). Mother argues the "unreasonable delay" had an adverse effect on her defense, forcing the associate judge to rely on evidence "that was no longer relevant, or at a minimum, inaccurate." According to Mother, this denied her a fair and speedy trial, thereby violating her due process rights.

The record shows the case was called for trial on October 12, 2017, less than two weeks before the statutory dismissal deadline set out in the Code. *See* TEX. FAM. CODE ANN. § 262.401(a), (b). When making her announcement, Mother's appointed counsel announced "not ready" because Mother was not present. Counsel advised the associate judge that Mother had been arrested the evening before, but was attempting to "bond out." Based on Mother's absence, due to incarceration, appointed counsel moved for a continuance. The motion was denied, but the associate judge only heard testimony from one witness, a Department witness who would have not been available at a later date. The associate judge then attempted to reset the matter to October 19, 2017, but Mother's appointed counsel, as well as the father's appointed counsel were unavailable due to prior settings. Thus, the associate judge reset the matter to October 26, 2017, but no hearing was held that day. The associate judge's notes indicate a reset of the matter to December 1, 2017, and there is a "Continuation of Trial Scheduling Order" continuing the case to December 1, 2017. The final hearing then reconvened on December 1, 2017. And pursuant to subsequent scheduling orders, the case continued on December 6, 2017, January 17, 2018, and February 21, 2018.

The record shows it took several days over the course of approximately four months to bring this matter to a conclusion. Throughout the trial, the associate judge noted the length of time it was taking to conclude the matter, remarking on the number of witnesses and emphasizing the repetitive nature of the questions by the attorneys and the resulting testimony. Despite his concerns of the repetitive nature of the proceedings, the associate judge allowed the attorneys for all parties to try the matter as they saw fit. Additionally, the delays were the product of availability of the attorneys as well as the associate judge's calendar.

First, neither section 262.401 of the Code nor any other provision therein mandates a deadline for the completion of trial once started. *See id.* More importantly, Mother never objected

to the resets or rescheduling orders on grounds that the delays violated her due process rights or on any other grounds. Thus, she has not preserved this complaint for our review. *See In re C.J.P.*, 2016 WL 240793, at \*2; *In re G.T.*, 2016 WL 7445037, at \*1-\*2 ; *In re J.N.*, 2014 WL 4978656, at \*2. Moreover, the associate judge noted that while the matter continued, the parents would be permitted to continue working their service plans. This benefitted Mother because she completed the "Changes to Protect Children Program" on November 20, 2017, and engaged in additional therapeutic visitation under the supervision of Carolina Delgado, who testified favorably for Mother. Thus, contrary to Mother's claim, it does not appear from the record the elongated trial schedule "had an adverse effect on [her] defense."

Mother disagrees, arguing it had an adverse effect because the associate judge was "left to rely on evidence and testimony that was no longer relevant or, at a minimum, inaccurate. There was no attempt to correct this effect by the [associate judge] requiring the Department to recall its witness[es] to explore the changes in [Mother's] circumstances over the five-month period while this case was pending." Even if true, this matter ultimately proceeded, at Mother's request, to a de novo hearing. And, as we noted above, a de novo hearing is a new and independent action, beginning a new process as to the issues raised by the party who requested the hearing. *In re C.O.*, 2018 WL 1733178, at \*2. If circumstances had so changed given the duration of the final hearing before the associate judge, Mother was at liberty to call witnesses and present evidence at the de novo hearing to establish such change, which she did, resulting in the trial court deleting one of the termination grounds found by the associate judge. *See id.*

Based on the foregoing, we hold Mother has failed to preserve her complaint that the length of the final hearing before the associate judge violated her due process rights. Even if preserved, we would hold there was no violation of Mother's rights to due process based on the length of the final hearing before the associate judge.

***Sufficiency of the Evidence — Grounds for Termination & Best Interests***

*Standard of Review*

A trial court may terminate a parent's right to a child only if it finds by clear and convincing evidence that the parent committed an act prohibited by section 161.001(b)(1) of the Code and termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b). "Clear and convincing evidence" is defined as "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. Courts require this heightened standard of review because termination of a parent's rights to a child results in permanent and severe changes for both the parent and child, thus, implicating due process concerns. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2015). When reviewing the legal and factual sufficiency of the evidence, we apply the well-established standards of review. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.206(a); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency); *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency). In sum, an appellate court must determine whether the evidence is such that the trier of fact could reasonably form a firm belief or conviction that determination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In conducting a sufficiency review, we may not weigh a witness's credibility because it depends on appearance and demeanor, and these are within the domain of the trier of fact. *In re J.P.B.*, 180 S.W.3d at 573. Even when such issues are found in the appellate record, we must defer to the fact finder's reasonable resolutions. *Id.*

*Grounds for Termination*

After the de novo hearing, the trial court found Mother's parental rights should be terminated on the grounds that she: (1) knowingly placed or allowed her sons to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in

conduct or knowingly placed her children with people who engaged in conduct that endangered their physical or emotional well-being; (3) used a controlled substance in a manner that endangered the health of safety of her sons and failed to complete a court-ordered drug treatment program. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (P). However, only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in a child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re R.S.-T.*, 522 S.W.3d 92, 111 (Tex. App.—San Antonio 2017, no pet.); *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied). Thus, if multiple predicate grounds are found by the trial court, we will affirm based on any one ground, assuming a proper best interest finding, because only one predicate ground is necessary for termination of parental rights. *In re E.W.*, 494 S.W.3d 287, 292 (Tex. App.—Texarkana 2015, no pet.); *In re I.G.*, 383 S.W.3d 763, 768 (Tex. App.—Amarillo 2012, no pet.); *see In re A.A.T.*, 2016 WL 7448370, at *10 (Tex. App.—San Antonio Dec. 28, 2016, no pet.) (mem. op.).

In this case, the trial court found Mother engaged in conduct or knowingly placed R.L.L. and A.L.L. with people who engaged in conduct that endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'Endanger' ... 'means to expose to loss or injury....'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see In re K-A.B.M.*, 551 S.W.3d 275, 285 (Tex. App.—El Paso 2018, no pet.); *In re L.E.S.*, 471 S.W.3d 915, 923 (Tex. App.—Texarkana 2015, no pet.); *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied). Although endangerment under subsection (E) must be a direct result of a parental course of conduct — a voluntary, deliberate, and conscious course of conduct, the conduct does not have to be directed at the child, nor does it have to cause an actual injury to the child or even constitute a concrete threat of injury to the child. *In re K-A.B.M.*, 551 S.W.3d at 285; *In re L.E.S.*, 471 S.W.3d

at 923; *In re M.J.M.L.*, 31 S.W.3d at 350–51 (citing *In re M.C.*, 917 S.W.2d at 269; *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied)). Subsection (E) is satisfied by proof that parental conduct jeopardized or exposed to loss or injury the child's physical or emotional well-being. *Boyd*, 727 S.W.2d at 533; *In re L.E.S.*, 471 S.W.3d at 923; *In re M.J.M.L.*, 31 S.W.3d at 351. The term "conduct" includes a parent's actions and omissions. *In re K-A.B.M.*, 551 S.W.3d at 285 (citing *In re M.J.M.L.*, 31 S.W.3d at 351).

The commission of criminal conduct by a parent may support termination under section 161.001(b)(1)(E). *In re K-A.B.M.*, 551 S.W.3d at 286. Such conduct supports termination under subsection (E) because it exposes a child to the possibility that the parent may be incarcerated. *Id.* Sergeant Mitchell Scoggins of the Boerne Police Department, who is the sergeant "over narcotics detail" and "responsible for investigating narcotics activity," testified that on October 11, 2017 — the day before the final hearing before the associate judge began — he had arrangements to meet with Mother to purchase methamphetamines.

The sergeant explained his meeting with Mother came about after an informant told him Mother was engaging in narcotics trafficking, specifically methamphetamines. The informant provided the sergeant with a cell phone number to contact Mother. On October 6, 2017, Sergeant Scoggins, acting in an undercover capacity, texted the number provided by the informant and asked if Mother "had work for [him]." The sergeant explained "work" is a slang term used to inquire about the availability of methamphetamines. Mother responded "yes" and he inquired about prices for a half an ounce of the drug and a full ounce — also known as a "zip." Mother responded that it would be $350.00 for half an ounce and $550.00 for a zip. On October 9, 2017, Mother contacted the sergeant asking if he still wanted the drugs. When he advised he did, she agreed to meet him in Boerne so he could purchase an ounce of methamphetamines. Mother explained the drugs would be gift wrapped or placed in gift bags. She seemingly bragged about having "pound

quantities of methamphetamines in the car that was already wrapped up in gifts, and she was stopped by the police and they did not find it because it was wrapped as gifts."

The two planned to meet in Boerne on October 11, 2017. The sergeant was able to locate Mother's vehicle because she sent him photographs of a black Nissan. Mother also sent a photograph of the gift bag containing the drugs she had agreed to sell to him. As she was nearing the meeting site, Mother made an illegal U-turn in front of one of the officers who was looking for her based on the sergeant's description. Mother was stopped and the vehicle was searched. Officers discovered a gift bag matching the photograph of the one sent by Mother to Sergeant Scoggins. However, the bag did not contain methamphetamines; rather, it contained "sea salt that was wrapped to simulate methamphetamines." Mother admitted knowing the package contained sea salt, confessing she intended to sell the sea salt as methamphetamines. During the search, officers found drug paraphernalia — a scale and baggies. At that time, Mother was arrested for "five Class C offenses." A couple of days later, Sergeant Scoggins learned the car Mother had been driving was stolen. At that point, he obtained a warrant to arrest Mother for unauthorized use of a motor vehicle. Although she was arrested, Mother had not yet been indicted at the time of the sergeant's testimony.

Sergeant Scoggins testified narcotics trafficking is dangerous as it is related to property crimes and crimes against people. He said those involved in trafficking "more times than not" carry some kind of weapon. The sergeant further testified that purporting to sell a narcotic that is, in fact, not a narcotic is "still dangerous." He explained such activity could result in retaliation by the purchaser, endangering the purported seller and those around him or her. He stated it would be dangerous for children to be around such activities.

The foregoing evidence shows criminal activity that exposed Mother to incarceration. Mother was, in fact, incarcerated on the morning her final hearing before the associate judge began.

Criminal activity that exposes a parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child. *In re L.E.S.*, 471 S.W.3d at 924; *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see Boyd*, 727 S.W.2d at 534.

There was additional evidence regarding Mother's drug activity. Olivia Stevens, who was Mother's Department case worker for five months, testified Mother's aunt, L.W., sent her screenshots from Mother's Facebook page that showed Mother was selling "bars." Ms. Stevens testified the use of the word "bars" was a reference to Xanax, and therefore Mother was selling drugs through her Facebook page. This activity continued, according to Ms. Stevens, from December 2016 through February or March 2017.

There was also testimony regarding Mother's own use of illegal drugs. Mother admitted the Department became involved with her family because of her drug use — specifically use of methamphetamines. In 2016, it was reported that Mother was abusing methamphetamines and neglecting the children by leaving them in their car seats while she engaged in drug use and locking them in a bathroom for twelve hours with methamphetamines and syringes. *See Boyd*, 727 S.W.2d at 533; *In re L.E.S.*, 471 S.W.3d at 923; *In re M.J.M.L.*, 31 S.W.3d at 351. At the time of the initial allegations, R.L.L. was two years old and A.L.L. was a one-year-old infant. By her own admission, Mother continued to use drugs until January 28, 2017, though according to Ms. Stevens, despite drug-test results showing she was positive for methamphetamines, Mother refused to admit using that drug, telling Ms. Stevens she only used marijuana. Mother testified that after January 28, 2017, she no longer used drugs. According to testimony, she tested positive for drugs in February 2018, but clean in April and May. However, the evidence at the final hearing and the de novo hearing showed Mother tested positive for amphetamines and methamphetamines in August 2017

and September 2017. A parent's use of drugs may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d at 346; *In re K-A.B.M.*, 551 S.W.3d at 287.

As a result of the positive drug tests, Mother's drug counselor from Lifetime Recovery, Don Bentley, recommended on October 5, 2017 — a week before the final hearing — that Mother engage in inpatient drug treatment. This, despite her completion of the drug outpatient program that was part of her service plan. Mr. Bentley testified Mother's drug issues "were just too deep for me to be able to get into [on] outpatient level." He stated Mother claimed the positive results on the August and September drug tests were "false positives caused by hair dies [sic], caused by antihistamines, any number of over-the-counter medications." Mother continually "swore" to him she was not using. Mr. Bentley was of the opinion that Mother was trying to explain away the positive results. Given her continuing issues with narcotics, Mr. Bentley specifically opined that he did not believe the children should be returned to Mother because "she is very early in her recovery."

Mother disputed or tried to explain away the foregoing evidence. Mother claimed with regard to the events involving Officer Scoggins that he continually enticed her and that she ignored him time after time. However, she admitted at the de novo hearing that even though she knew her final hearing was at hand, she drove to Boerne intending to sell what she purported to be methamphetamines. With regard to the stolen vehicle, she claimed she purchased the vehicle from someone named Carlos for $1,500.00 and did not know it was stolen.

As for her drug use, Mother admitted using methamphetamines, but testified she had not used drugs since January 28, 2017. She claimed the positive drug test results from August and September of 2017 were erroneous. Mother testified and produced evidence that she took a private drug test in November 2018, which she paid for. That test showed she was negative for, among other things, amphetamines, cocaine, opiates, and marijuana. According to Mother, the hair

follicle test she paid for covered the preceding six months. However, the documentary evidence produced by Mother, specifically Exhibit 7, establishes only that it was a "hair" test for "5-Substances." It does not include information about the time period covered by the test. Mother also pointed out that at her own expense she signed up for aftercare counseling with Elite Counseling. The contract with Elite Counseling requires that Mother submit to random drug testing.

"'[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct.'" *In re L.E.S.*, 471 S.W.3d at 924 (citing *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *In re N.S.G.*, 235 S.W.3d 358, 367–68 (Tex. App.—Texarkana 2007, no pet.)); *see J.O.A.*, 283 S.W.3d at 345 n.4; *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) (holding that "[e]vidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). "Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *In re L.E.S.*, 471 S.W.3d at 924 (quoting *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)); *see Vasquez v. Tex. Dep't Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (recognizing propriety of terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child).

Mother's incarceration, which resulted from her decision to sell what she purported to be methamphetamines to an undercover officer, coupled with her decision to leave her children unattended around drug paraphernalia, and drug use during the course of this case, establish an

endangering course of conduct. *See In re J.O.A.*, 283 S.W.3d at 346; *In re K-A.B.M.*, 551 S.W.3d at 287; *In re L.E.S.*, 471 S.W.3d at 924; *see Boyd*, 727 S.W.2d at 534. Viewing the evidence in the manner required by each standard of review, we conclude that it is both legally and factually sufficient for a reasonable trier of fact to form a firm belief or conviction that Mother engaged in a course of conduct that endangered the physical or emotional well-being of the children. *See In re J.F.C.*, 96 S.W.3d at 263; *In re K-A.B.M.*, 551 S.W.3d at 287. Having found the evidence sufficient to support this termination ground, we find it unnecessary to address the two remaining grounds upon which termination was based. *See In re E.W.*, 494 S.W.3d at 292; *In re A.A.T.*, 2016 WL 7448370, at *10.

## *Best Interests*

In a best interest analysis, we apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We recognize there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). Thus, to determine whether a child's parent is willing and able to provide the child with a safe environment, we also consider the factors set forth in section 263.307(b) of the Code. *Id.*

Additionally, evidence that proves one or more statutory grounds for termination may be probative to prove termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2012) (holding same evidence may be probative of both section 161.001(1) grounds and best interest, but such evidence does not relieve State of burden to prove best interest). In conducting a best interest analysis, a court may consider in addition to direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Finally, a trier of fact may measure a parent's future

conduct by her past conduct in determining whether termination of parental rights is in the child's best interest. *Id.*

In analyzing the evidence within the *Holley* framework, we recognize that evidence of each *Holley* factor is not required before a court may find that termination is in a child's best interest. *C.H.*, 89 S.W.3d at 27. In other words, the absence of evidence as to some of the *Holley* factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in a child's best interest. *Id.* Moreover, in conducting our review of a trial court's best interest determination, we focus on whether termination is in the best interest of the child — not the best interest of the parent. *In re D.M.*, 452 S.W.3d 462, 468–69 (Tex. App.—San Antonio 2014, no pet.).

1. Desires of the Child

At the time of the final hearing, R.L.L. was four years old and A.L.L. was three years old. *See* Tex. Fam. Code Ann. § 263.307(b)(1) (child's age and physical and mental vulnerabilities); *Holley*, 544 S.W.2d at 371–72. Neither child provided testimony regarding their desires regarding conservatorship. Mother testified that at the conclusion of a visit just prior to the final hearing, R.L.L. told her he "wanted to come home to me, Papa Chris, and Santa Clause [sic]." Mother further stated R.L.L. asked at every visit if he could come home. Carolyn Sue Jerico, a licensed counselor originally tasked with overseeing visits between Mother and her sons, testified the boys would ask: "Do we have to go, Mommy? Can we go with you, Mommy?" The Department ultimately removed Ms. Jerico from her role as visitation supervisor. Carolina Delgado, a clinical social worker who subsequently monitored Mother's visits with R.L.L., testified R.L.L. expressed a desire to go home with Mother at visitation sessions. Ms. Delgado began supervising visitation in late October or early November 2017, overseeing six or seven visits prior to her testimony.

However, Allison Henace, who was R.L.L.'s therapist from May 2017 through October 2017, testified that during her sessions with R.L.L., he called Mother by her first name and said "she was mean and that she hit him, and that he didn't want to visit her." *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (whether child is fearful of living or returning to his home); *Holley*, 544 S.W.2d at 371–72. Ms. Henace stated R.L.L. was very connected to his foster father, M.B., and had a trusting relationship with him. M.B., who took possession of R.L.L. in August 2017, testified R.L.L. told him that it was Mother who said R.L.L. would be coming home with her and Papa Chris. M.B. stated that R.L.L. said he wants to live with M.B. and M.B.'s husband — R.L.L.'s other foster father.

L.W., Mother's maternal aunt, testified she and her husband (Mother's brother) took possession of R.L.L. and A.L.L. in early 2017. Although R.L.L. did not remain in the home for long due to his behavioral issues, A.L.L. remained with his aunt and uncle until he was reunited with his brother and placed with M.B. and his husband in mid-November 2017, after the final hearing had begun. L.W. and her husband intervened in the termination proceedings, seeking conservatorship of the boys. She testified that the last time she saw R.L.L., which was in late October or early November — after the final hearing had begun and while she still had A.L.L., he asked if he could come home with her. According to L.W., R.L.L. asked if he could "spend the night" at her house. L.W. further testified they were permitted to see A.L.L. three times after he was placed with his brother in M.B.'s home. L.W. stated that at the conclusion of each visit, A.L.L. stated he wanted to go home with L.W.[6]

The evidence regarding the children's desires regarding placement was conflicting. As the triers of fact, it was within the domain of the associate judge and the trial court to assess credibility.

---

[6] L.W. and her husband did not appeal from the termination order. Accordingly, they are not parties to this appeal.

*See In re J.P.B.*, 180 S.W.3d at 573. It was for the trier of fact to resolve the conflict, and we must defer to the fact finder's reasonable resolutions. *Id.*

   2. *Emotional & Physical Needs/Emotional & Physical Danger/Parenting Abilities*

   R.L.L.'s emotional needs were the subject of a great deal of testimony. When removed from Mother, R.L.L. showed aggression toward any female caretaker with whom he was placed. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. In his first foster family, R.L.L. was aggressive toward the foster family's special-needs daughter and his foster mother. Due to his aggression, the placement lasted less than a month. After a short placement in respite care, the boys were placed with L.W. and her husband, but R.L.L. again displayed anger issues. L.W. testified R.L.L. "was exhibiting extreme behaviors of hurting himself, hurting others, hurting his brother, hurting us … [and] [h]e was having issues in daycare." As a result, R.L.L. was sent to a facility for treatment on several occasions during his placement with L.W. In fact, R.L.L. did not return to the home of his maternal aunt and uncle after his third stay at the facility. Officials at the facility recommended he not return to the home of his aunt and uncle, and there was testimony that neither wanted R.L.L. to return, although L.W. disputed this, testifying she wanted R.L.L. returned, but only once he was provided with proper therapy by the Department. The Department found R.L.L. an emergency placement at K Star, where he had issues with the female director. Thereafter, he was placed in a therapeutic foster home with C.A., a female, who after less than a month asked that R.L.L. be removed due to his aggression.

   Ms. Henace, the therapist who saw R.L.L. from May through October 2017, testified that it was reported to her that R.L.L. "was having a lot of aggression, a lot of tantrums … was very noncompliant with adult direction … was irritable … talking a lot about violent things like shootings and stabbings." She noted he had five to ten placements. She worked with him on anger control and connecting with adults. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544

S.W.2d at 371–72. Ultimately, in August 2017, R.L.L. was placed with M.B. and his husband. Ms. Henace testified that after this placement, R.L.L. was much calmer and his play became much less aggressive. R.L.L. felt safer and was very connected to his foster father, M.B., resulting in significant gains with his behavioral issues. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. Given that R.L.L.'s aggression was so pronounced with female caretakers, and given that he told Ms. Henace that he did not want to visit Mother, Ms. Henace opined that R.L.L. should be in a home without a female caregiver. *See In re J.L.B.*, 349 S.W.3d 836, 848–49 (Tex. App.—Texarkana 2011, no pet.) (affirming best interest finding and noting among other things that children's emotional and physical needs would be better served with parents more like foster mother); *see also* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. She stated his current placement with M.B. "would be in [R.L.L.'s] best interest clinically." *See In re J.L.B.*, 349 S.W.3d at 848–49; *see also* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. Ms. Henace further testified about the importance of maintaining the sibling bond between R.L.L. and A.L.L. She stated R.L.L. should be in a home with A.L.L. as long as it does not disrupt his placement with M.B., which provides R.L.L. with a positive connection. *See In re J.L.B.*, 349 S.W.3d at 848–49; *see also* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. So positive, in fact, were R.L.L.'s gains following his placement with M.B. and his husband that Ms. Henace felt continued counseling was unnecessary. *See In re J.L.B.*, 349 S.W.3d at 848–49; *see also* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72.

M.B. testified he was aware of R.L.L.'s issues when he was placed in their home. R.L.L. was seeing Ms. Henace for counseling and he was on medication. However, since the placement, counseling has been discontinued and the medications have been "scaled back some." M.B. said R.L.L. is "doing really well." He also noted that the maternal aunt, L.W. favored R.L.L.'s

placement in their home until A.L.L. was also removed from her care and placed in M.B.'s home. M.B. testified A.L.L. and R.L.L. are bonded and "are getting along great." R.L.L. no longer shows aggression toward his younger brother.

Mother testified she was aware that R.L.L. had been aggressive toward women in his placements. She stated her belief that this resulted from R.L.L. seeing his biological father abuse her. Mother stated R.L.L. was "copying" his biological father. Olivia Stevens, who was Mother's Department case worker from November 2016 through April 2017 testified Mother did not "appear to understand the extent of [R.L.L.]'s needs." *See In re J.L.B.*, 349 S.W.3d at 848–49; *see also* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. She noted that Mother "was dropped" from her domestic violence class on two separate occasions, and the record shows Mother did not complete the class until November 2017, during the pendency of the final hearing.

As to A.L.L.'s emotional and physical needs, Department case worker Angela Christman testified he is "highly allergic" to dairy and eggs. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. A.L.L. was not permitted to have anything containing dairy or eggs. Ms. Christman testified Mother was aware of A.L.L.'s dietary restrictions. Ms. Christman testified she spoke at length with Mother about what the child could and could not have, but during visitation, Mother "would bring food that had dairy and eggs in it, and [A.L.L.] would have massive diarrhea." *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *id.* § 263.307(b)(12) (whether child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.2d at 371–72. The case worker stated she had to require Mother to send her photographs by text of the food she was planning to bring for A.L.L. so it could be checked for dairy and eggs.

Moreover, at the time of the final and de novo hearings, A.L.L. was three years old. Accordingly, he has the emotional and physical needs of any young child. At this age, he is unable to care or provide for himself, depending on the adults in his life for all his needs. *See* TEX. FAM.

CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72. The same is true for R.L.L., who was only four. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72.

With regard to the emotional and physical danger to the child — now and in the future, as well as Mother's parenting abilities, the evidence shows — as set out in detail above — Mother engaging in drug dealing — the "faux" drug deal in Boerne and selling drugs on Facebook — and drug use. *See* TEX. FAM. CODE ANN. § 263.307(b)(8) (history of substance abuse by child's family or others who have access to child's home); *id.* § 263.307(b)(12) (whether child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.2d at 371–72. On the day the final hearing before the associate judge began, Mother was absent because she was in jail, having been arrested the prior day based on her encounter with the Boerne Police Department. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

A parent's criminal activities and history are relevant to a best interest analysis — specifically to the emotional and physical danger to the child. *In re K.L.P.*, No. 04-17-00253-CV, 2017 WL 4014613, at *5 (Tex. App.—San Antonio Sept. 13, 2017, no pet.) (mem. op.); *In re R.T.*, No. 09-15-00425-CV, 2016 WL 821844, at *8 (Tex. App.—Beaumont, Mar. 3, 2016, no pet.) (mem. op.) (citing *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.)). Attempting to sell narcotics and drug use, tends to establish a course of conduct endangering the emotional and physical well-being of the child. *See In re K.L.P.*, 2017 WL 4014613, at *5 (citing *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied)). Criminal conduct and incarceration affects a parent's life and her ability to parent, thereby subjecting her children to potential emotional and physical danger. *Id.* (citing *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.)). This is yet another consideration for the fact finder in making a best interest determination.

A parent's performance under a service plan is also relevant to several of the *Holley* factors, including the emotional and physical danger to the child now and in the future, parental abilities, and stability. *Holley*, 544 S.W.2d at 371–72. It is also relevant to many of the factors set out in section 263.307(b): (1) the willingness of the parent to seek out, accept, and complete counseling services; (2) the willingness and ability of the parent to effect positive changes within a reasonable time; and (3) whether the parent demonstrates adequate parenting skills. TEX. FAM. CODE ANN. § 263.307(b)(10) (willingness of parent to seek out, accept, and complete counseling services); *id.* § 263.307(b)(11) (willingness and ability of the parent to effect positive changes within reasonable time); *id.* § 263.307(b)(12) (whether parent demonstrates adequate parenting skills). Given the connection between a service plan and the *Holley* and statutory factors, a parent's actions with regard to the service plan is relevant to a child's best interest. *In re A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.).

As previously noted, the Department prepared a service plan for Mother in November 2016. In an order signed December 15, 2016, the associate judge found Mother had reviewed, understood, and signed the service plan. One of Mother's case workers, Olivia Stevens, provided testimony regarding the Mother's initial actions relating to her service plan. Ms. Stevens testified that from November 2016 through April 2017, Mother failed to complete any of her service plan requirements. According to Ms. Stevens, in January 2017, Mother asked if she could move out of San Antonio, advising that she might move to either Austin or Houston. Ms. Stevens testified she told Mother that if she moved to Austin, they could provide access to services, but not if she moved to Houston. At that time, Mother had begun only her domestic violence class, but was dropped shortly thereafter.

In January 2017, Mother moved neither to Austin nor Houston, but testified she moved to Ganado, a small town between Victoria and Houston. Contrary to Ms. Stevens's testimony,

Mother testified she received permission to move, providing the Department with a list of possible places, and was told services would be available. It was only after her move that the Department advised services would not be available in Ganado. It appears Mother did not engage in any services until she returned to San Antonio in April 2017. *See In re R.L.G.*, No. 04-14-00238-CV, 2014 WL 4922927, at *7 (Tex. App.—San Antonio Oct. 1, 2014, no pet.) (mem. op.) (noting Mother's delay in beginning services as consideration for best interest determination).

Because of the delays due to her move out of San Antonio, Mother was unable to complete the entirety of her service plan by the time the final hearing began. Specifically, Mother had not yet completed her domestic violence class, finishing only in November 2017, albeit before the end of the final hearing and prior to the de novo hearing. *See* TEX. FAM. CODE ANN. § 263.307(b)(11). However, she had not engaged in inpatient drug counseling, which was recommended in the days before the final hearing began due to Mother's positive drug test results in August and September 2017. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *id.* § 263.307(b)(11); *id.* § 263.307(b)(12). According to her service plan, Mother was to complete a drug assessment and abide by all recommendations emanating from the assessment. *See* TEX. FAM. CODE ANN. § 263.307(b)(10).

The evidence regarding Mother's connection to drugs and her actions relating to her service plan are also relevant to Mother's parenting abilities — or lack thereof. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. As set out above, Mother has a history of activities relating to controlled substances — use and attempted sales. *See* TEX. FAM. CODE ANN. § 263.307(b)(8); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. However, Mother declined to submit to inpatient counseling. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. In addition, the Department presented evidence that Mother failed to recognize R.L.L.'s issues with regard to aggression, as well as A.L.L.'s dietary restrictions. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

### 3. *Available Programs to Assist Individual to Promote Best Interest*

As discussed above, the Department created a service plan for Mother, requiring her to, among other things, refrain from drug use and comply with any recommendations relating to her drug assessment. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *id.* § 263.307(b)(11); *Holley*, 544 S.W.2d at 371–72. There was testimony that Mother's drug issues were a main concern of the Department, yet she tested positive for methamphetamines in the two months prior to the final hearing, and failed to submit to inpatient drug counseling as recommended prior to the final hearing. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *id.* § 263.307(b)(11); *Holley*, 544 S.W.2d at 371–72.

### 4. *Plans for Children by Those Seeking Custody/Stability of Home or Proposed Placement*

Mother's plan for R.L.L. and A.L.L. is to have them reside with her in the housing she recently obtained. *See Holley*, 544 S.W.2d at 371–72. Mother presented testimony from the counselors who monitored her visitations with the boys — Carolina Delgado and Carolyn Sue Jerico. These counselors testified Mother is bonded with the boys and that it would be in their best interests to be returned to Mother. *See id.* Similarly, Mother's maternal aunt, L.W., testified that she too believed the boys should be returned to Mother. *See id.* Neither counselor had any concern about Mother's positive drug test results from August and September 2017, believing Mother is drug-free. L.W. testified Mother has changed and the boys would be safe with her.

However, the Department presented testimony from numerous witnesses that the boys should not be reunified Mother. *See id.* The Department also presented testimony, which is set out above, that R.L.L.'s current placement with M.B. and his husband is in his best interests given his statements about Mother and his aggression issues when he is placed with female caretakers. *See id.* There was also testimony from both sides that it would be better if the boys were placed together as they are now, and that R.L.L. has a strong connection with M.B., resulting in a

reduction in his medication and an end to counseling. *See id.* M.B. testified he and his husband planned to adopt both boys in the event parental rights were severed. *See id.*

5. *Act or Omissions Suggesting Parent-Child Relationship is Not Proper/Excuses*

With regard to the final *Holley* factors, the trial court heard evidence of the following acts and omissions by Mother, establishing the existing parent-child relationship is improper: (1) drug use up until just before the final hearing based on positive results in August and September 2017; (2) criminal activity resulting in incarceration that occurred the day before the final hearing; (3) delays in beginning her service plan; and (4) failing to engage in recommended inpatient drug counseling. *See Holley*, 544 S.W.2d at 371–72. As to evidence of any excuse for her conduct, Mother testified the positive drug test results were inaccurate, testifying she has not used drugs since January 28, 2017, and pointing to her private, negative hair follicle test from November 2017. Although she attempted to explain away the stolen car issue — testifying she had purchased the car and had no knowledge it was stolen — she had no excuse for the "faux" drug deal involving the Boerne Police Department other than her claim that she simply gave in after the undercover officer continued to contact her. As for timeliness regarding her service plan, Mother claimed her failure to engage in services prior to her return to San Antonio, which was several months after she was first provided with her service plan, was the Department's failure to provide her with the necessary referrals at her location. *See id.* As for her failure to engage in inpatient drug counseling, which was recommended not long before the final hearing, Mother testified her case worker refused to help her. She claimed her case worker advised the Department would not assist with inpatient counseling prior to termination.

Analyzing the evidence under the applicable law and appropriate standards of review, we hold the trial court could have reasonably determined termination of Mother's parental rights was in the children's best interests. *See J.P.B.*, 180 S.W.3d at 573; *H.R.M.*, 209 S.W.3d at 108.

**CONCLUSION**

Based on the foregoing analysis, we hold: (1) Mother failed to preserve her due process claims for our review; (2) Mother failed to establish her ineffective assistance of counsel claim; (3) the evidence is legally and factually sufficient for a reasonable trier of fact to form a firm belief or conviction that Mother engaged in a course of conduct that endangered the physical or emotional well-being of the children, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), *In re J.F.C.*, 96 S.W.3d at 263; and (4) the trial court could have reasonably determined termination of Mother's parental rights was in the children's best interests. *See J.P.B.*, 180 S.W.3d at 573; *H.R.M.*, 209 S.W.3d at 108. Accordingly, we overrule Mother's complaints and affirm the trial court's order of termination.

Marialyn Barnard, Justice